The Illinois Central Railroad Company, Appellant, *v.* Basil W. Alexander *et al.*, Appellees.

### APPEAL FROM JO DAVIESS.

A Railroad Company may assume the double character of carriers and warehousemen, and that their duty as carriers is ended when they have placed goods entrusted to them in a safe depot of their own, or in any other safe warehouse.

Such companies have a right to charge a reasonable compensation for warehouse services; and are to be considered and treated like other warehousemen. And may retain goods in possession until reasonable warehouse charges thereon shall have been paid.

This was an action of trover brought by appellees againt the appellant for eight hundred and twenty-one sacks of salt. Declaration in the usual form in trover.

1st Plea, General issue.

2nd Plea, That defendant was a common carrier and warehouseman, and as such received the salt in question, and at the time when, etc., a large sum was due to the Railroad Company for transportation, and also a sum as warehouse charges, which sum the plaintiffs refused to pay, and defendant kept possession of the salt until the charges should be paid.

3rd Plea, That defendant had a lien upon the salt in question, as warehouseman, for storage, at the time when, etc.

General replication, denying that any sum was due either for freight or storage, and issues thereon.

On the trial, *George W. Campbell,* a witness for the plaintiffs, testified: That the salt in question was the property of the plaintiffs; that he was the consignee of said salt; that there were 1,000 sacks of it in all, 179 of which were received in good order in December last; the balance, 821 sacks, came to Galena at various times between January 1st and March 1st, 1857, on defendant's railroad; the sacks were frozen together, and were broken in getting them out of the cars; witness refused to receive these 821 sacks as in good order; defendant's depot in Galena was divided across the centre by a rope; the defendant occupied the east half, and the witness and H. F. McClaskey the west half; witness proposed to put the salt on his side of the depot, not as a delivery, but subject to the order of defendant's agent, but said agent objected; witness claimed damages on the salt, and offered to refer that question to referees, on condition that the damages caused by the delay in the transportation of the salt should not be included in the reference; defendant's agent, Petrie, would not agree to it.

About 13th March, 1857, everything relating to damage to sacks of salt was, by agreement, referred to referees, who made the following award: " Galena, March 13th, 1857. We, the undersigned, being called upon by the freight agent of the Illinois Central Railroad Company, and George W. Campbell, to assess the damages on 821 sacks of salt, now lying in the freight depot, consigned to George W. Campbell, Galena, by Alexander & Lansing, of St. Louis, have examined the same, and assessed the damage at fifteen cents per sack, which does not include the damage by delay." This was on Friday or Saturday, witness thinks Saturday; the damages, fifteen cents per sack, were deducted from the freight, and the witness paid the balance of the freight on the salt; on Monday witness sent to remove the salt, and afterwards went over himself; Petrie presented bill of 20 cents per sack for storage of the salt, and $2\frac{1}{2}$ per cent. commissions for advances made by defendant; 175 of the sacks were on witness' side of the depot; Petrie said he would not deliver

the salt until the bill was paid; witness refused to pay it; the 175 sacks of salt were then removed from witness' side of the depot to defendant's side, without the consent of witness; this was within a few days after the reference, don't remember the exact time.

Plaintiff's counsel then asked the witness this question: " What was the value of the salt at the time you went over ? " which was objected to by defendant. Objection overruled, and exception taken.

Witness said salt was selling at $2.50 to $2.75 per sack; I demanded the salt that had been consigned to me by Alexander & Lansing; I was a forwarding and commission merchant; salt was consigned to me for sale on their account; the prices for storage of a lot of salt of that kind at that time was ten cents per sack, for all the time that that salt was in store; the salt came at different times; the reference was on the 13th of March; some of the salt had been in store three months, some not one month; the salt has ever since remained in possession of the defendant; witness has never attempted to get it since; witness saw the salt before the commencement of this suit, and a considerable time after damages were assessed; that it was very much damaged; sacks were torn and badly damaged.

Defendant's counsel objected to any evidence as to the condition of the salt, after the assessment of damages, on the ground that the damages had been paid. Objection overruled, and exception taken.

Witness further testified that Petrie subsequently offered to give him the salt free of charges, but he refused to receive it.

On his cross-examination the witness testified that the depot was divided by a rope running across it, and by no other division. When witness went over for the salt, he told Petrie he was surprised at the amount of the bill which he, Petrie, presented; Petrie told him he could not have the salt until it was paid. Salt ran down in price during the summer; it was worth $2 per sack at the middle of March.

*Charles E. Duer* was then called by plaintiffs, and testified as follows: I was in the employ of George W. Campbell on the 13th day of March, 1857, and had been for two or three years before; I know the salt in controversy; after the damages were assessed, I went and paid the freight to the defendants, less the damages as assessed; defendant's agent receipted the bills for freight, witness receipted for the salt; 175 to 200 sacks of salt were then on Campbell's side of the depot; balance were on defendant's side; Campbell had told Petrie that they might put the whole of the salt on his side of the depot until the damages were settled; witness notified Petrie not to remove the salt

3

from Campbell's side of the depot; that he considered the whole of the salt received, although a portion of it was on defendant's side of depot; Petrie said that we should not remove it until the bill of storage was paid; sometime after, Petrie notified us that he was willing we should remove the salt, free of charge; this was several weeks after the damages were assessed; the salt was then in a much worse condition than it was when the damages were assessed; it had thawed out.

Defendant's counsel objected to all testimony as to the condition of the salt after the damage had been assessed. Objection overruled, and exception taken.

Witness then testified that defendant wasted a good deal of salt in moving it, putting it down a slide into the lower story of the depot; how much was wasted he could not tell. On his cross-examination witness said Mr. Campbell said, when he told Petrie to put salt on his side of the depot, that he would not consider it received until the damages were assessed.

*John Louvain* called by plaintiffs and testified as follows: Am a forwarding and commission merchant in Galena; know the warehouse of defendant; saw the salt in dispute when it arrived; saw it about 13th of March, piled up in the depot; have seen it since; the only damage that could happen to the salt while in the depot was in putting it down the slide into the lower story; it was thrown down the slide without care, and roughly handled; some of the salt was wasted in this way; can't say how much.

*Geo. W. Campbell* was then recalled by plaintiffs. Plaintiffs' counsel asked him: " Did you act under the instructions of the plaintiffs in relation to this salt, as their agent? " Defendant objected to this question as improper, because witness should state what he did in the matter. Objection overruled, and exception taken. Witness answered that he acted in the capacity of agent for the plaintiffs and corresponded with them in relation to the matter, and that the salt was consigned to him as a commission merchant originally.

*J. M. Ryan* was called by defendant. His testimony tended to show that the salt was worth $2 per sack, in Galena, on the 13th of March.

*Henry Petrie*, whose deposition was read by defendant, testified as follows: I was station agent for defendant from 22nd of November, 1856, to 10th of August, 1857; was engaged in warehouse business for several years before that time; the salt in question was received in defendant's warehouse in the months of January and February last, to the best of my recollection, and remained there when I left; I should think the storage was worth ten cents per hundred for the first month; after that I

should charge according to the warehouse room aud locality; the freight on the salt was paid by Mr. Campbell, the consignee; 15 cents per sack was deducted from the transportation for damage done to the sacks; the salt was frozen very hard, and crowbars had to be used to get them out of the cars; I made a warehouse charge on that salt and presented it to the consignee; it was not paid; don't remember what reason was assigned for not paying it; nothing was ever settled in regard to the salt and freight; I presented the bill for warehouse charges the next day after the freight was settled; the warehouse charges were not paid, and for that reason I retained the salt; afterwards I was instructed by the general freight agent to deliver the salt free from warehouse charge, and I offered to do so to Mr. Campbell before the commencement of this suit, or before the service of process on me; the offer was made before the 23rd day of July last, I think; Campbell did not receive the salt; he objected, I think, not on account of the amount of the charges, but objected to paying warehouse charges at all; when the salt was received I had no special instructions in relation to the warehouse charge on the salt; I charged it because I thought it was right; Mr. Campbell and myself disagreed about it; I asked time to refer it to the general freight office, to which he consented; they instructed me to collect the charge, of which I informed him; afterwards I was instructed to deliver the salt to him free of charge, and offered to do so as before stated; neither plaintiffs nor their agent ever asked for said salt after said offer, to my knowledge; if they had, they would have got it.

Cross-examined. The freight and damages were settled about the 13th of March, 1857; it was not our practice to present freight bills, but the practice was to give the parties notice that the goods were there and the amount of charges at the time of the receipt of the goods. I think Mr. Campbell had such notice; at any rate he knew that the salt was there. It was our practice when we gave such notice, to include all charges upon the goods up to the time the notice was given; this was the only warehouse charge I ever attempted to collect for the railroad company, at the time I was agent for it; it was not customary to make warehouse charges on goods received at the Galena office. Mr. Campbell did not, during the winter or spring, offer to receive the salt and pay the charges on it, if the defendant would settle the damages to the sacks; at first he refused to receive the salt on account of delay in transportation; afterwards abondoned that claim, and set up a claim for damages to sacks, at fifty cents per sack. I offered to refer it at the time; he refused at first, but afterwards agreed to it, as before stated.

*Geo. L. Evret,* called by defendant, testified as follows : Have been in the employ of defendant as clerk in the freight house at Galena, since a year ago last August. There are printed rules on the freight bills ; the printed freight bills and the rules thereon are the same as have always been used by defendant since witness has been in the service.

The printed freight bill shown to the witness is itself attached to the record, and was read in evidence, together with the rules thereon, some of which rules are as follows :

All the articles of freight arriving at their place of destination, consigned to residents, and they notified of, within business hours, must be taken away the same day ; and if consigned to non-residents, must be taken away within twenty-three hours after being unloaded from the cars, the company reserving the right of charging for storage on the same, if they see fit, after those stated periods.

The company will be responsible only as warehousemen for property in their warehouse.

*Geo. W. Campbell,* called by defendant, and testified as follows : That he had receipts of defendant for freight paid on the 179 sacks of salt, received in December, which receipts he produced, and they were read in evidence with the printed rules on the back of them. Witness testified that he had received perhaps a thousand of these receipts. Witness then produced the receipts for the 831 sacks of salt in controversy, which were read to the jury.

Said witness, *Campbell,* on cross-examination, testified : That he had never read the matter on the back of these receipts ; that he had done business with defendant ever since he came to Galena, and never paid storage before ; that this was the only charge for storage made him ; that it was very common to leave goods in the depot longer than the time named in the printed rules ; never knew a storage bill made by defendant before ; witness and defendant were never particular about the line dividing their respective parts of the depot ; company frequently had goods on his side of the line, and he on their side ; I think there was no uniform custom of the defendant to charge storage at Galena.

The jury found a verdict for the plaintiffs for $1,876.03. The defendant moved the court for a new trial, which motion was overruled, and the defendants excepted.

J. M. DOUGLASS, GLOVER & COOK, and G. CAMPBELL, for Appellant.

LELAND & LELAND, for Appellees.

CATON, C. J.   The law is now too well settled to bear discussion, that a railroad company may assume the double character of carriers and warehousemen.   That their duty as carriers is ended when they have placed the goods in a safe depot of their own or any other safe warehouse.   That their depot is their warehouse, and that for warehouse services they have a right to charge a reasonable compensation, the same as other warehousemen.   The railroad company in this case, after their relation to the goods as common carriers had ceased, is then to be considered and treated the same as other warehousemen would be considered and treated in case the goods had been placed in another warehouse.   The agent of the plaintiffs below had abundant notice that the company claimed the right to charge for storage after the goods had remained in the depot one day, and by suffering the goods to remain in the warehouse for any length of time, when by such rule they would be subject to charge, he impliedly agreed for his principal to pay reasonable charges for the storage, and until these charges were paid, the company were not bound to let the goods go.   While a lien for these charges existed, which the agent of the plaintiffs neglected or refused to pay, the company was not guilty of a conversion, by retaining the goods for such non-payment.   If the charges claimed for the storage were unreasonable, Campbell should have tendered a reasonable amount for the charges, and then if the company had refused to receive it and deliver the goods, it would have been guilty of a conversion.   There is so much evidence tending to show that the company had a fair and legitimate claim on these goods for storage, which would justify their retention, that we are of opinion that the case should be submitted to another jury.   A new trial is therefore ordered.

The judgment is reversed and the cause remanded.

*Judgment reversed.*