# CHARLESTON.

## BLOYD *v.* M. & J. POLLOCK.

Submitted June 5, 1884.—Decided November 21, 1885.

1. If a vendor sells goods to a vendee to be delivered at the depot in a certain city, or to be delivered in the cars at the depot in a certain city, the goods remain the goods of the vendor when shipped by railroad, till they arrive at the depot in such city, and till then they are at the risk of the vendor. But upon their arrival at the depot in such city without being unloaded and without any notice of their arrival at the depot, they at once become the property of the vendee and are thenceforth at his risk. (p. 128.)

2. A court ought not to grant an instruction to a jury, which is irrelevant or tends to mislead them, and therefore a court ought not to grant an instruction to a jury, which is based on an hypothesis in reference to the facts, which there is no evidence tending to sustain; nor should the court grant an instruction which is based on an hypothesis, which there is some evidence tending to support, if such evidence is so weak, that it would be the duty of the court to set aside the verdict as contrary to the weight of evidence, if it was based solely on the assumption that such hypothesis was in fact true. (p. 129.)

27 75
32 605

27 75
39 100

27 75
42 719

27 75
46 188

27 75
48 327

27 75
ie56 529
57 339

27 75
58 555

27 75
c 59 19

27 75
61 102

27 75
e62 503
62 574

27 75
64 271

3. An appellate court will not reverse the judgment of a court below, because it permitted counsel to read law from the books or reports against the objection of the other side, when such law was read before the granting of any instructions, nor if it was read after the granting of such instructions, if the law so read was in accord with the instructions. And though it is the duty of the court to prevent the reading of law by counsel, which conflicts with the instructions of the court, *Quære*: If the court should violate its duty in that respect and permit such law to be read against the objection of the other side, would an appellate court in any case for such reason award a new trial? (p. 142.)

*Caldwell & Caldwell* for plaintiffs in error.

*Ewing, Melvin & Riley* for defendant in error.

GREEN, JUDGE:

This was an action of *assumpsit* brought by Stephen L. Bloyd against Mortimer Pollock and Julius Pollock, millers, doing business as M. & J. Pollock, to recover damages for 487 bushels of wheat sold and delivered by the plaintiff to the defendants on February 5, 1884, at $1.05 per bushel amounting to $511.35 less the freight on the same $20.00, the balance due being $491.35 with interest from February 5, 1884. The suit was instituted in the circuit court of Ohio county. The declaration was filed at the March rules, 1884, and the damages laid in it were $800.00. It contained only the common counts for work and labor, for goods, wares and merchandise sold and delivered by the plaintiff to the defendants at their special instance and request and for money lent and advanced and for monies had and received by the defendants for the use of the plaintiff with the general *indebitatus assumpsit* count. With this declaration was filed a bill of particulars setting out the demand of the plaintiff in detail as above stated. At the next term of said court on March 12, 1884, the defendants appeared and pleaded not guilty to this declaration, and issue was joined thereupon, which issue was tried by a jury, who were sworn on November 28, 1884, and found a verdict for the plaintiff on December 1, 1884, assessing his damages at $515.00. Thereupon the defendants moved the court to set aside this verdict and grant them a new trial; which motion was acted upon on January 3, 1885, when the following entry was made:

"This day came the parties, by their attorneys, and the motion of the defendants heretofore made to set aside the verdict of the jury herein and grant them a new trial coming on to be heard, the defendants assigned as the grounds of said motion that the verdict of the jury was contrary to the law and evidence, misdirection of the jury in giving each of the instructions respectively to the jury on motion of the plaintiffs, refusal to give each of the instructions refused to be given to the jury on motion of the defendants, and the arguments of counsel were fully heard and taken under advisement by the court."

This motion was finally acted upon by the court on January 9, 1885, when the following judgment was rendered and made:

"This day came the parties, by their attorneys, and the court having maturely considered the motion of the defendants heretofore made to set aside the verdict of the jury herein and grant them a new trial, doth overrule said motion; to which ruling and judgment of the court overruling the defendants' said motion to set aside the verdict of the jury and grant them a new trial herein, the defendants, by their attorneys, except. Whereupon, it is considered by the court that the plaintiff S. L. Bloyd recover against the defendants M. & J. Pollock the sum of $515.00, the damages assessed by the jury aforesaid, with interest, thereon from December 1, 1884, until payment, and his costs about the prosecution of his suit in this behalf expended; to which last mentioned judgment of the court the defendants, by their attorneys, except.

"And on motion of the defendants, and with the consent of the plaintiff, it is ordered that bills of exceptions to any and all rulings or judgment of the court heretofore excepted to in this action, may be offered, signed, sealed and filed in the clerk's office within forty days after the end of the present term with the same effect and to be considered by the court as if offered, signed, sealed and filed in court during the present term thereof."

In accordance with this consent-order bills of exceptions were formally made out, signed and sealed within said forty days in said clerk's office. And on February 7, 1885, the

court entered on the record-book in open court an order recognizing that the said bills of exceptions had been so filed in said clerk's office, duly signed and sealed and ordered to be made a part of the record in this action. The bill of exception sets out all the evidence which was before the jury whether given by the plaintiff or defendants. This evidence was to some extent contradictory. I shall in order to a proper understanding of the case state not only all the facts which I regard as material, and which I think were fully established, but will set forth some of the evidence, which I deem immaterial, and some of the conflicting and contradictory evidence. I deem it necessary to state the case thus fully, in order that the instructions, which were given or refused by the court below, as well as the modification to certain instructions, which were required to be made by the court, and the grounds, on which the court below acted in admitting certain evidence, which was objected to by the defendants' counsel, may be the more fully comprehended. The case as it was thus presented to the jury, as shown by the evidence certified, was when stated in this manner substantially as follows:

The plaintiff had for a number of years been engaged in dealing in wheat at a store located on the Baltimore and Ohio Railroad at a station on said railroad located about twenty-two miles from Wheeling known as Glen Easton. The defendants during this time were engaged in milling in Wheeling, where their mill is located. The plaintiff very frequently during these several years probably some twenty times sold to the defendants as millers car loads of wheat at certain agreed prices per bushel, the wheat to be delivered by the plaintiff on the cars at the depot in Wheeling, the freight to be paid by the defendants and to be deducted from the price agreed to be paid to the plaintiff. These various contracts for the sale of car-loads of wheat were exactly the same, except that the price per bushel of the wheat differed, being in each case fixed by the agreement of the parties. Under all these several parol contracts, probably twenty in number, when the wheat so shipped by the plaintiff to the defendants arrived at the depot in Wheeling, the cars containing it were by the agents of the company placed upon a side track close

to the depot, where it was most convenient to the defendants to unload said cars, and they were there invariably unloaded by the defendants.

The defendants testified that they never did unload and take possession of this wheat at any time, till the agents of the company at Wheeling had first presented to them a bill for the freight, and until they had first paid the fireight, as the company never would deliver anything to them till they had first paid the freight.

But agents of the company testified that it was not true, that the company never did deliver anything to the defendants, till they first paid the freight; that the habit of the agents of the company was sometimes to notify merchants and others, including the defendants, of the arrival of goods by sending them the bill for the freight on the goods, but sometimes merchants and others, including the defendants, ascertained that their goods had arrived by their drivers making enquiry at the depot. If the parties were perfectly reliable and responsible, their goods were delivered before the freight was paid, or before the freight-bill was made out or. presented. They had not required the defendants always to pay their freight on what was sent them before they hauled the wheat away. Most generally the defendants, when they received a carload of wheat, unloaded it from the car and took the wheat away, before they paid the freight, and before the freight-bill was made out and presented to them, or they were otherwise formally notified of the arrival of the wheat. This was allowed because they were regarded as perfectly responsible, and as the cars would be in the way sometimes, if allowed to stand on the switch till the manifest, from which the freight-bill was made out, could be examined. And till such examination and correction was made, the freight-bill was never made out and presented.

In the latter part of January, 1884, the plaintiff made a verbal contract with the defendants, whereby he sold them a carload of wheat at $1.05 a bushel, to be delivered on the cars at the depot in Wheeling, the contract being just like verbal contracts, which had been made by these parties from time to time for years preceding, the only difference being in the price to be paid per bushel for the wheat. The under-

standing of the parties as to what were the obligation of each
of the parties as to the delivery of wheat had been shown
by their conduct in reference to the delivery of wheat for a
number of years preceding. The defendants always un-
loaded the cars from a side-track or switch near the depot
in Wheeling. It is true, that one of the defendants states,
this contract in language different from that used by the
plaintiff, which is substantially given above. But if the
whole of the evidence of this defendant is taken together,
it is obvious, that there is no real difference between the two
statements. He expressly states that this contract was the
same, that the defendants had made with the plaintiff for
years preceding in the purchase of wheat from him, and ad-
mits, that whenever they bought a carload of wheat under
any of these contracts upon its arrival in Wheeling at the
depot, they unloaded the car and hauled the wheat to their
mills, and in no instance was a carload of wheat unloaded
by the plaintiff, or by the agents of the Baltimore and Ohio
Railroad Company. But he insists that this contract made
in the latter part of January, 1884, was that they would buy
the wheat he had on hand at $1.05 per bushel delivered *on
the depot in Wheeling*. Their contracts with the plaintiff on
all previous occasions he also insists was that the wheat
should be delivered *on the depot in Wheeling*. This ambigu-
ous phrase in all these contracts as to place of delivering
was, it would seem, made perfectly clear by the uniform in-
terpretation given to it by the parties. The wheat was al-
ways delivered on the car at the depot in Wheeling, the de-
fendants, the purchasers always unloading the car and hauling
the wheat away to their mill. No carload under any of these
contracts having ever been unloaded by the plaintiff, or by
the agents of the Baltimore and Ohio Railroad Company at
Wheeling. The parties had clearly interpreted these con-
tracts, all of which were alike, not to require the plaintiff to
unload the wheat and place it on the platform or on any other
part of the depot, as this defendant in his testimony admits;
that in no single instance had the wheat been taken out of
the car by the plaintiff or the agents of the company, and
yet dispite this uniform interpretation of the contract this
defendant insists that the language, which he says was used

in all these contracts to designate the place of delivery of the wheat, that is, *on the depot in Wheeling*, meant on the *platform of the depot in Wheeling*, and this though by the conduct of the parties this contract had never been so interpreted but had always been interpreted as meaning *on the cars at the depot in Wheeling*. A meaning which it could as well have borne as that attempted to be placed upon it by the defendant. For if the terms used in describing the place of delivery was *on the depot in Wheeling*, they would be literally construed *on the top of the depot-building at Wheeling*, a perfect absurdity, and I can not, if such language was ever really used in making these contracts, interpret it as meaning *on the platform of the depot at Wheeling* in opposition to an interpretation placed on it by the parties. This, the plaintiff in substance says, was the language of these contracts; and as this defendant states facts, which show that it was always so understood by the parties, I can not regard the statement of the defendant as to the substance of this contract as differing at all from the statement of the plaintiff.

A witness, Shriver Woods, who overheard a conversation between the plaintiff and this defendant with reference to this contract heard the defendant ask the plaintiff: "Was not our contract that you were to deliver the wheat on the depot at the city of Wheeling?" And the plaintiff said "Yes; I shipped the wheat to you though." The plaintiff denies this; and the defendant, with whom this conversation was had, states it somewhat differently: He says he asked the plaintiff: "Did you not agree to deliver the wheat to us at the depot in Wheeling, not at Glen Easton?" And he replied, "Yes I did. I don't deny it." From this the fair inference is, that the plaintiff means simply to admit, as he still does, that the wheat was to be delivered not at Glen Easton but at Wheeling.

It was proven that under this contract made in the latter part of January, 1884, the defendants having furnished the necessary sacks to the plaintiff he on February 5, 1884, at about 3 P. M., shipped in 205 sacks 487 bushels of wheat on the Baltimore and Ohio Railroad, that being the only railroad at this point. It was consigned to the defendants at Wheeling, their address being attached to the car in the usual

manner. It was shipped on the way-train which reached Wheeling safely between five and six o'clock, P. M., of that day running on its usual or schedule time. The wheat when it reached Wheeling was in good condition and merchantable. The defendants were notified of this shipment by a letter from the plaintiff mailed the same day. This letter reached Wheeling and was delivered to the defendants the next morning, February 6, 1884, about eight o'clock. The defendants then had no personal knowledge of the arrival of this car in Wheeling. But they knew that by the schedule time it ought to have reached Wheeling between five and six o'clock, P. M. the day before. But they also knew that the running of this way-train was very irregular, and sometimes it would be as much as three days before a carload started at the distance of Glenn Easton for Wheeling reached there.

At same time on February 5, 1884, there was a great flood, which produced an unprecedented rising of the Ohio river at Wheeling. But the river had not risen to a sufficient height on February 5, 1884, to at all interfere with anything shipped over the Baltimore and Ohio Railroad to Wheeling. And this wheat arrived in Wheeling in perfect safety and entirely uninjured. This car of wheat was put out on the side-track, where cars of wheat belonging to the defendants were usually placed, when they reached Wheeling, about ten A. M. of February 6, 1884, which was shortly after the time the defendants received by mail the letter from the plaintiff notifying them of the shipment of the wheat. But the defendants never did receive any notice from the agents of the company at Wheeling by the presentation of the bill for the freight or in any other manner, that this carload of wheat had actually arrived at the depot.

The flood continued to rise in the Ohio river; but when this carload of wheat was put on the side track or switch for the defendants on the morning of February 6, 1884, it had not risen up to the main track of the railroad by several feet. And this switch, on which was this carload of wheat, was some three feet higher than the main track. It was four or five o'clock, p. m. of February 6, 1884, before the water had risen to such an extent as to overflow the main

track of the railroad and to interfere with the unloading of cars on this switch where this carload of wheat had been placed in the morning for the defendant. They could easily have unloaded the wheat in three hours time. But some time after four or five o'clock p. m. of February 6, 1884, the waters of the Ohio river had risen so high as to overflow not only the main track but the switch and this wheat in this car was seriously damaged by being thoroughly wetted in the sacks. The defendants made no enquiry as to whether this wheat had or had not arrived, though they had received notice of its shipment at eight o'clock that morning, and as the agents of the company did not notify them they had no actual knowledge of its arrival till after the flood subsided. Some other property, which had been shipped to this depot, and which was at it, was injured by this flood. After the subsidence of the flood the defendants refused to pay for this carload of wheat insisting that it had not been delivered and they then refused to receive it as it had been seriously damaged by the flood. This was substantially all the evidence and facts brought before the jury.

During the progress of the case the defendants objected to the reading before the jury as evidence the letter of the plaintiff to the defendants notifying them of the shipment of the wheat to them, which letter was received by the defendants the morning of February 6, 1884. But the court overruled the objection and permitted the letter to be read to the jury. On the cross-examination of one of the defendants the plaintiff's counsel put to him the question : "Did you ever cause the plaintiff to unload cars of wheat sent to the defendants?" To this question the defendant answered : "Not a full carload no; no sir." The defendants counsel objected to this answer going to the jury as evidence, which objection was overruled by the court; and the defendants' counsel excepted to this action of the court, but no formal bill of exceptions was taken.

The bill of exceptions which was signed by the judge having set out all the evidence in the case as stated above proceeds as follows:

"Whereupon the case was argued to the jury, and during the first address of plaintiff's counsel he cited to the jury

the case of *Pacific Iron Works* v. *Long Island R. R. Co.*, 62 N. Y. 272, and offered and began to read the said case from the printed volume of said reports to the jury, and the defendants, by their counsel, objected to the same being read to the jury. But the court overruled the objection, the defendants objected; and the case was read in the arguments of plaintiff's counsel.

"The case having been argued on both sides to the jury, and the plaintiff having asked, after the conclusion of the evidence and before the conclusion of said arguments, the following instructions from the Court to be given to the jury, They are here inserted in the words and figures following, to-wit :

## "PLAINTIFF'S INSTRUCTION No. 1.

"If the jury find from the evidence that the plaintiff sold to the defendants the wheat in question, the same to be delivered in a railroad car of the Baltimore and Ohio Railroad Company at the depot of said company in the city of Wheeling; that within a reasonable time thereafter the plaintiff delivered to the said company the said wheat for transportation in one of its cars to said depot; that the said wheat was thereupon placed by the said company in one of its cars, to which was affixed, according to the usual course of business, the address of the defendants; and that the said wheat arrived in due course of transit, in the said car, and in proper condition at such depot, then the jury should find for the plaintiff, even though they should further believe that the said wheat was, after such arrival, injured or destroyed by water or otherwise.

## "PLAINTIFF'S INSTRUCTION No. 2.

"If the jury believe from the evidence that the plaintiff sold to the defendants the wheat in question and agreed to deliver the same in a car belonging to the Baltimore and Ohio Railroad Company at the depot of the said company in Wheeling; that within a reasonable time thereafter the plaintiff shipped the said wheat in a car, properly addressed, of the said company; that the said car so containing the said wheat duly arrived at the said depot, then from and after such arrival, the said Baltimore and Ohio Railroad Company was not the agent of the plaintiff with respect to

said wheat, and no responsibility attaches to the plaintiff by reason of any failure, if failure there was, on the part of the said railroad company to give notice to the defendants of such arrival.

### "PLAINTIFF'S INSTRUCTION No. 3.

"If the jury believe from the evidence that defendants bought the wheat ·in the testimony referred to; that the same was to be delivered by the plaintiff in a car of the Baltimore and Ohio Railroad Company at the freight depot of said company in the city of Wheeling, and that 'the car containing said wheat duly arrived at said depot, with the said wheat in good condition, then, from the time of such arrival the said wheat belonged to the defendants, and their liability to pay for the same attached, even though there may have been a failure on the part of the Baltimore and Ohio Company to notify the defendants of such arrival.

"And the defendants objected to the giving of each of the foregoing instructions, but each of. said objections were overruled by the court, and all of the said instructions were given by the court to the jury; to which last mentioned rulings and judgments of the court overruling said objections, the defendants severally excepted, and also severally excepted to the giving of each of said instructions to the jury by the court."

After the conclusion of the evidence and before the conclusion of the arguments of counsel to the jury the defend-· ants asked the court to give an instruction to the jury. The said instruction was in the words and figures following, to-wit:

### " DEFENDANTS' INSTRUCTION No. 1.

" No. 1.—If the seller of goods undertake to make delivery of the goods sold at a city at some distance from the place from which the goods were to be shipped by the seller, the seller thus assumes the risk of the carriage, and the carrier becomes the agent of the seller; and the property in the goods will not pass until the delivery is actually made.

" But the court refused to give the said instruction to the jury; to which ruling and judgment of the court the defendants excepted. The court offered to give the said instruction to the jury, modified at the suggestion of the court, by in-

serting therein after the word ' at ' and before the word ' a
city ' therein, the words, ' a place specified in the contract of
sale in,' and modified at the suggestion of the court by adding
at the end of said instruction the words, ' at the place speci-
fied in he contract of sale,' so that the instruction so modified
read as follows:

" If the seller of goods undertake to make delivery of the
goods sold at a place specified in the contract of sale in a city
at some distance from the place from which the goods were
to be shipped by the seller, the seller thus assumes the risk
of the carriage, and the carrier becomes the agent of the
seller, and the property in the goods will not pass until the
delivery is actually made at the place specified in the contract
of sale.'

" The defendants objected to each of said modifications, and
excepted severally to the rulings and judgments of the court
to the effect that the modifications must be made or the in-
struction refused, and then asked that the same, so modified,
might be given to the jury, subject to the said exceptions,
which was accordingly done.

" The defendants at the same time that they asked the
court to give to the jury the above instruction, also asked
the court to give with it three other instructions to the jury,
numbered respectively, two, three and four, in the words and
figures following, to-wit:

'DEFENDANTS' INSTRUCTION No. 2.

" If the jury believe from the evidence that S. L. Bloyd
sold the wheat for the price of which this suit was brought,
to be delivered on the depot at Wheeling, but that said wheat
never was delivered on the depot at Wheeling, then the ver-
dict of the jury should be for the defendants.

" DEFENDANTS' INSTRUCTION No. 3.

" If the jury believe from the evidence that the plaintiff, S.
L. Bloyd, sold to the defendants the wheat for the price of
which the suit is brought, to be delivered on the depot in
Wheeling, and that the agreement to deliver on the depot
meant that the delivery should be on the platform or plat-
forms of the depot or other part of the depot, and that the
wheat was not delivered on such platform or platforms, or
other part of the depot, then the verdict of the jury should
be for the defendants.

" Defendants' Instruction No. 4.

" If the jury believe from the evidence that the plaintiff contracted with the defendants to deliver certain wheat on the depot at Wheeling, he would be bound to deliver the wheat as he had contracted to do, although they may believe under previous contracts between the plaintiff and defendants to the effect that he would deliver wheat on the depot in Wheeling, the defendants had received the wheat about which such previous contracts were made, not on the depot at Wheeling, but from cars or a car on the B. & O. R. R. on a track near and outside the depot in Wheeling, when they were notified of its arrival, and although they would have received the wheat, for the price of which this suit is brought, from a car on the B. & O. R. R. track outside and near the depot in Wheeling if they had been given notice by the Railroad Company of the arrival of the wheat at Wheeling, or had known of the arrival in Wheeling of such wheat at the time it arrived.

"But the court refused to give the said instructions numbered two and three to the jury, unless the words 'unless the jury believe from the evidence that the defendants waived such delivery,' should be added in each after the conclusion of the same as above. To which the defendants objected and excepted to the last mentioned rulings and judgments of the court, and then excepted, subject to said objections and exceptions, of the offer of the court to give said instructions to the jury numbered two and three, and they were so given with the additions above indicated. And the instruction numbered four was given to the jury.

"At the same time that the defendants asked the court for the instructions aforesaid, the defendants also asked the court to give with them to the jury the instructions numbered five and six, in the words and figures following, to-wit:

"Defendants' Instructions No. 5 and 6.·

"No. 5.—If the jury believe from the evidence that S. L Bloyd contracted with the defendants to deliver on the depot in Wheeling the wheat for the price of which this suit is brought, and that he shipped the same from Glen Easton, W. Va., to Wheeling, consigned to the defendants, by the B. & O. R. R. Co., but that the defendants were not at any

time notified of the arrival of the wheat in Wheeling and did not know of its arrival there until after it was damaged by the flood, then the verdict of the jury should be for the defendants.

"No. 6.—If the jury believe from the evidence that the plaintiff contracted with the defendants to deliver the wheat for the price of which this suit is brought on the cars at Wheeling, then the defendants would not be liable for the price of such wheat until the railroad company had notified the defendants of its arrival in Wheeling.

"But the court refused to give either of said instructions to the jury; to which rulings and judgments of the court defendants severally excepted. Thereupon the defendants asked the court to give to the jury instruction numbered seven in the words and figures following, to-wit:

"Defendants' Instruction No. 7.

" 'No. 7.—If the sellers should sell wheat, undertaking to make delivery thereof at a city at some distance from the place at which the goods are to be shipped by the seller, he thus assumes the risk of the carriage, and the carrier is the vendor's agent, and such agency continues until the carrier shall make delivery according to law to the buyers. If a railroad company is the carrier, the company to make a legal delivery must deliver the wheat to the buyer personally, or else notify him of the arrival of the goods in the city.'

"The court refused to give the last mentioned instruction to the jury; to which ruling and judgment of the court, the defendants excepted. The court offered to give to the jury instead of the last mentioned instruction, an instruction as follows:

"If the seller should sell wheat, undertaking to make delivery thereof at a place specified in the contract of sale in a city at some distance from the place from which the goods are to be shipped by the seller, he thus assumes the risk of the carriage, and the carrier is the vendor's agent, and such agency continues until the carrier shall make delivery at the place so specified according to law to the buyer.

"Which offer of the court to give the instruction last mentioned in place of instruction numbered seven, was declined by the defendants, and the instruction as offered by the court as aforesaid was not given.

"No other instructions were asked for or given to the jury, except an instruction asked for by the plaintiff and given to the jury by the court in the words and figures following, to-wit:

### PLAINTIFF'S INSTRUCTION    No. 4.

"If the jury find for the plaintiff, and if they should further find that a price for the wheat in question, had been agreed upon between the plaintiff and defendants, then the amount of the verdict should be such contract price, with interest thereon from the time of the arrival of said wheat at the depot of the Baltimore and Ohio Railroad Company in the city of Wheeling, which instruction was not objected to by the defendants.

"And as elsewhere appears in the record of the said case, the same was argued and submitted to the jury, who rendered a verdict for the plaintiff; the defendants made a motion that the court set aside said verdict and grant them a new trial, which motion was argued, submitted to and overruled by the court; to which ruling and judgment of the court the defendants excepted; all of which appears of record as aforesaid; and the court entered judgment on the verdict, to which the defendants excepted, and tendered this their bill of exceptions to the aforesaid rulings and judgment of the court, asked that the same might be signed and sealed by the court and made part of the record in this court, which is here accordingly done."

To the judgment of the court overruling defendants' motion for a new trial and rendering judgment for plaintiff the defendants obtained a writ of error and *supersedeas*. The errors assigned in the petition fully appear from the bill of exceptions above stated.

To the full comprehension of the case I deem it proper to give the whole evidence of the defendant who made the contract, which is the basis of this suit. His evidence in relation to this contract will be given in full in his exact language. It is as follows:

### EXAMINATION-IN-CHIEF.

Question.—"Will you state when you bought this wheat from Mr. Bloyd, and what the contract was, and when it was?"

Answer.—"Well, some time in January Mr. Bloyd came into the mill and asked me the price of wheat. I told him $1.05. And after talking some time, he says, 'Well, I will sell you what I have got at that price.' I says, '$1.05 a bushel, delivered on the depot in Wheeling.' We always make that a part of the contract, delivered on the depot, because we never want to take any risks in the carriage."

Question.—"You made the contract in January to be delivered on the depot at Wheeling?"

Answer.—Yes, sir."

Question.—"What was the next you heard about it?"

Answer.—Well, I sent him out a certain number of sacks, I think about 180, on January 28. He then sent back for some more sacks, and I sent them out to him. The next I heard was that this letter came; that he had shipped the wheat."

Question.—"Do you remember what time you got that letter?"

Answer.—"It was in the morning delivery. I suppose it was delivered there about 8 o'clock.    •

Question.—"Why didn't you then go and get the wheat?"

Answer.—"I don't remember when we ever got the wheat the next day after it was shipped. Very often we wait two and three days before we can get the car put out there, and we never go after wheat, either carloads or parcels, until they have brought the bill and collected it, for they never deliver anything to us until we pay the freight. Then we go and sign their receipt for it. After that they issue the order for the wheat to be brought out."

(Plaintiff's counsel objects.  Objection overruled.)

Question.—"As I understand you then, they never have delivered you any wheat or other goods until you sign the receipt?"

Answer.—"No, sir, not until we sign the receipt."

Question.—"When did you first get the knowledge that it was there?"

Answer.—"After the flood went down. After the flood went down that young man, who sits here in a chair, came up and said, 'What are you going to do with that wheat?' I said, 'We don't intend to do anything with it. I bought good sound wheat, and we don't take unsound wheat.'"

Question.—"You claimed to him that it was not your wheat?"

Answer.—Yes, sir, I did."

Question—"Do you know whether other persons' goods were lost there?"

Answer—"Yes. I think other parties lost some goods. My recollection is that the tobacconist, Mr. Marsh, lost some tobacco. I think that was the only thing damaged.

Question—"All you know of?"

Answer—"Yes. Had they come up on Wednesday morning, the morning that the water come up, and given us notice we could have hauled the wheat out long before the water come up to the car; because we can unload a car, 500 bushels of wheat, in three hours, and not work very hard at that. It would have been no trouble at all for us, if they had notified us that the wheat was there; but we had no notice—knowed nothing about it."

Question—"How did you usually or invariably get notice?"

Answer—"By them sending us a bill of freight—freight-bill. They always send a freight-bill up and collect freight."

Question—"State whether or not any goods were ever delivered to you before the delivery of the freight bill."

Answer—"No, sir. I don't remember that we ever got any freight before signing their freight-book. We have got to go there and sign a receipt and they issue an order, and our man gets the order and goes off to somebody else before he can get the freight. They won't let you take freight without that."

Question—"You say the contract was to deliver on the depot at Wheeling?"

Answer—"Yes, sir. He always was to deliver on the depot in Wheeling. Now, I take it off the side-tracks, but that is for the accommodation of the railroad to save them labor."

Question—"Who was this wheat to be delivered to?"

Answer—"To M. & J. Pollock. We bought the wheat from Mr. Bloyd to be delivered on the depot in Wheeling."

Question—"State whether you had any conversation with Mr. S. L. Bloyd about this contract at your office after the

flood, and when that conversation was, as near as you can fix it."

Answer—"I can't tell the date exactly when the conversation took place, but it was some time after the wheat was lost—after the flood. Mr. Bloyd had been in, wanting to know what we were going to do about it, whether we intended to pay for it or not; and I told him we did not unless we were compelled to by law. We were standing out by the Market street door; we were not in the office. I was sitting on a barrel and Mr. Bloyd came in and we got to talking about the contract; and I says to Mr. Bloyd, 'Did you not agree to deliver that wheat to us on the depot in Wheeling, not at Glen Easton?' And he says, 'Yes, I did. I don't deny it.' That is the conversation we had that day."

Question—"Who was present besides yourselves?"

Answer—"Mr. Shriver Woods was present at the time and heard the whole conversation, and I called his attention to it at the time."

Question—"You did what?"

Answer—"I called Mr. Wood's attention to Mr. Bloyd's admission that day, because he heard it."

CROSS EXAMINATION BY MR. EWING.

Question—"Do you undertake to say that Mr. Bloyd was to unload that wheat here under your contract with him?"

Answer—"No, sir, I don't undertake to say anything of the kind."

(Defendants' counsel objects, on the ground that the witness is called on to construe the contract; objection overruled; defendants' counsel excepts.

Question.—" You then did not understand that Mr. Bloyd was to unload the wheat out of the car when it arrived here, now?"

Answer.—" Well, when we say on the depot in Wheeling, of course we mean that the wheat be brought there and put on the depot. That is the contract."

Question.—" Do you mean by that that he is to unload the wheat there?"

Answer.—" Yes, sir."

Question.—"Was that what you contracted for in this case?"

Answer.—" That is what we contracted for in this case."

Question.—"You meant that at the time you entered into it?"

Answer.—"Yes, sir."

Question.—"Had you ever caused a carload of wheat to be so treated before?"

Answer.—"No, sir, I don't believe I ever did."

Question.—"Have you ever done so since?"

Answer.—"No, sir."

Question.—"What reason was there for that at that particular time?"

Answer.—"We always try to fortify ourselves in a contract, so that we will have no-trouble with the railroad company or steamboats. We make that contract always."

Question.—Have you previously received goods from Mr. Bloyd in that way?"

Answer.—"Yes, sir."

Question.—"Had you ever made a contract with him that he should unload them before?"

Answer.—"Yes, sir; always made the contract with him that he should unload them on the depot at Wheeling."

Question.—"Did you ever cause him to unload them."

Answer.—"Not a full car load; no, sir."

(Defendants' counsel objects. Objection overruled. Defendants' counsel excepts.)

Question.—"You know where Glen Easton is situated on the Baltimore and Ohio Railroad, do you?

Answer.—"Yes, sir, I have been out there."

Question.—"That letter of Mr. Bloyd's, saying that he had shipped the wheat to you on the morning of the 6th—that he had shipped it the previous day; how ong does it take after wheat is shipped out there for the train to bring it to Wheeling after it is shipped?"

Answer.—"Indeed I don't know, Mr. Ewing, because if you will let me, I will tell you. On the 8th of September there was a carload of wheat shipped to us from Roseby's Rock, this side of Glen Easton, and we never could get it from the Baltimore and Ohio depot until the 13th."

Question.—"Ain't that unusual?"

Answer.—"No, sir, I have had it from Mr. McMechen's bottom four or five days out."

Question.—" How long would it take a carload to come from there to Wheeling ?"

Answer.—" Well, I believe the railroad men say until five or six o'clock from there."

Question.—" When you got notice that the wheat was shipped, did you go to see that the wheat had arrived ?"

" Answer.—" No, sir."

Question.—" If they had sent you word that it was there you could have unloaded it and saved it ?"

Answer.—" Yes, sir."

Question.—" Would you have done so ?"

Answer.—" Yes, sir, if I had got the order."

Question.—"If you had found the car on that switch where you usually unloaded, would you have unloaded it ?"

Answer.—"I would if they had notified us."

Question.—"When Mr. Bloyd went to see you about this, wasn't your sole objection against the payment for this wheat that you ought not to pay for it on the ground that the railroad company had not given you notice of its arrival? Wasn't that the only objection that you had at that time to paying for it ?"

Answer.—"Well, I really can't say whether that was the objection, or what was the objection at that time."

Question—"Wasn't that the only objection that you made at that and at subsequent times, in speaking of the matter, that they had not given you notice of its arrival ?"

Answer—"Yes, sir."

Question—"And that was the reason you wouldn't pay for it ?"

Answer—"Yes; my talk with Mr. Bloyd was that the wheat never had been delivered to us. Because, had the wheat been delivered to us, we could have taken care of it and saved it."

Question.—"If the company had notified you of its arrival you would then have taken it in pursuance of your contract ?"

Answer—"Yes, sir."

Question—"You would not have required it to be unloaded ?"

Answer—"No, sir."

Question—"You would have unloaded it?"

Answer—"Yes, sir."

Question—"Who was to pay the freight on this wheat?"

Answer—"We were to pay it and deduct it from the bill."

Question—"Then, if I understand you, after the arrival of the wheat at Wheeling, there was nothing that Mr. Bloyd would have to do in order to get it away from the company?"

Answer—"No, sir."

Question—"And that you would have taken it upon their notifying you that is was here?"

Answer—"Yes, sir."

Question—"About what time in January—can you give the date—did you buy this wheat from Mr. Bloyd?"

Answer—I shipped him sacks on the 21st of January; and the second lot of sacks went out about the 2d of February. How long before we made the contract, I don't remember."

Question—"You had previously, however, bought the wheat?"

Answer—"Yes, a few days before."

Question—"At the price this charges you, one dollar and five cents?"

Answer—"Yes."

The evidence shows, that the wheat, the subject of controversy in this case, was sold by the plaintiff to the defendants in the latter part of January, 1884, to be delivered in a reasonable time thereafter in a car at the depot in the city of Wheeling, the sacks, in which such wheat was to be placed for shipment, to be furnished by the defendants. These sacks were furnished and in a reasonable time thereafter, on February 5, 1884, this wheat, 487 bushels, was shipped in a car properly addressed to the defendants in Wheeling and arrived there on the evening of the same day. When this wheat was shipped the defendants were duly notified thereof by the plaintiff, who addressed them a letter advising them of its shipment. The defendants received this letter by mail about eight o'clock a. m. the next day. A flood had commenced on February 5; and the Ohio river rose to an unprecedented heighth  It was very

high on the morning of February 6, but had not then over-flowed the track of the railroad. It continued to rise throughout the day and by night had overflowed the track of the railroad and the cars standing upon it. The car containing the wheat consigned by the plaintiff to the defendants had about ten o'clock a. m. of February 6, 1884, been placed by the agents of the railroad company on a switch adjoining the railroad track at the depot and lying about three feet higher than the main track, in order that the defendants might conveniently unload it and remove the wheat to their mill in Wheeling. This was what the agents of the company had for years privious been accustomed to do with cars containing wheat for the defendants, the defendants always unloading the cars and hauling the wheat to their mill.

The agents of the company in their testimony speak of this placing of this car of wheat on this switch as a delivery of the wheat to the defendants. They however claim that it was no delivery, because they had not been notified by the agents of the company of the arrival at the depot of this car of wheat, and they had no knowledge that it had actually arrived in Wheeling till after February 6, 1884, at which time this wheat was seriously damaged by being thoroughly wetted, the car in which it was having been overflowed by the flood in the Ohio river. They allege that they did not consider themselves bound because of the receipt of this letter notifying them of the shipment of the wheat to make enquiry as to whether it had arrived or not, while they knew it might have arrived prior to the morning of February 6, 1884, yet they also knew that it might not arrive for several days thereafter. The freight-trains coming to Wheeling over the Baltimore and Ohio railroad being frequently delayed two or three days beyond their time of arrival according to the railroad-schedule; and therefore they expected the agents of the Baltimore and Ohio Railroad Company at Wheeling by the presentation of the freight-bill or in some other way to notify them of the arrival of every carload of wheat consigned to them. And this was always done by them, they never permitting the defendants to unload the wheat from any car and haul it away, till the freight had

been paid.   But this custom was denied by the agents of the
Baltimore and Ohio Railroad Company.   On the contrary
they asserted that the defendants frequently unloaded the
cars assigned to them and hauled away the wheat before the
freight-bill had been  presented to them.   The arrival of a
car assigned to them was frequently ascertained by enquiries
made by their drivers; and  frequently  no notice  was given
them  by the agents  of the company either  by the presenta-
tion  of the freight-bill  or otherwise  before the  car was un-
loaded by  the defendants and  the  wheat hauled away.   For
reasons which will be hereafter stated I regard this diversity
in the evidence as of no importance in this suit.

I have stated that  by the contract, on  which  this suit is
brought, the wheat was to be delivered in a car at the depot
in Wheeling, and I consider, that there was no evidence be-
fore the jury, from  which any  other  conclusion  could be
drawn; though the counsel  for  the  defendants did insist,
that by this contract the wheat  was  to  be delivered by  the
plaintiff  on the platform  of  the  depot of the Baltimore  and
Ohio Railroad Company at Wheeling.   But I can find in the
record no evidence, on  which such  claim can  be based, cer-
tainly none worthy of consideration.   The only evidence,
which is relied on to sustain this position, is that of Mortimer
Pollock one of the defendants.   His  evidence on  this sub-
ject has  been  stated in full in the statement I have made of
the case.   In his testimony he  reiterates  more than half a
dozen times that in all his contracts with the plaintiff he con-
tracted to *deliver  the wheat on the depot at  Wheeling.*  · This was
of course  impossible to be performed literally, and if these
contracts had been in writing, and  the  stipulation  in them
had been, that the plaintiff would  deliver the wheat *on*  the
depot in Wheeling, the court would have interpreted the con-
tracts as requiring the plaintiff to deliver the wheat *at* the depot
in Wheeling.   And such contracts  could not have been in-
terpreted as requiring  the plaintiff to  deliver the wheat on
the platform of the railroad at the depot in Wheeling.   But
if we admit, that contracts so worded were ambiguous, we
would in interpreting them, as in interpreting all other writ-
ten contracts, have looked at the surrounding circumstances
existing, when the contracts were  made, at the situation of

13

the parties, at the subject-matter of the contract, and at the acts done by the parties, when they undertook to construe and execute the contracts. *Crislip, Guardian, &c.* v. *Cain,* 19 W. Va. 483, and the authorities there cited.

If the contracts were verbal, as in this case, the same mode of interpreting would of course be adopted, if the words of the contract were, as in this case, ambiguous. Applying these rules and relying only on the testimony of the defendant, Mortimer Pollock, what would be the interpretation placed on these contracts ? The plaintiff was a merchant residing twenty-two miles from Wheeling, the defendants were millers residing in Wheeling. Under these circumstances, while the plaintiff might be willing to sell his wheat and contract to deliver it in Wheeling, thus taking upon himself the risk of delivering at the depot in Wheeling, it would be highly improbable, that he would undertake to see, that this wheat was unloaded from the cars and placed upon the platform of the railroad company at its depot in Wheeling. This duty he could not without great inconvenience to himself perform, while if the wheat had arrived safely in the cars at the depot in Wheeling, the defendants, who resided there, could readily see that the wheat was unloaded either on the platform or in their wagons. In fact it is probable, that the defendants would not even desire the wheat unloaded on the platform, as it would proably be more convenient to them to unload it directly from the cars into their wagons, if it could be done, or if the railroad company would furnish a switch upon which the car could be placed, and where the wheat could be conveniently unloaded directly from the cars into the wagons of the defendants. The surrounding circumstances, the situation of the parties and the subject-matter of the contracts would all seem to clearly indicate, that, if in making the contracts they used the words to be delivered *on* the depot, they meant *on* the cars at the depot, and not *on* the platform at the depot.

Looking still only to the testimony of Mortimer Pollock as to the acts, which had been done by the parties, when they undertook to execute these contracts, we are forced to the conclusion that they never intended, that the wheat should be unloaded on the platform at the depot, and never

contracted for its being done. Though for many years wheat had been shipped under these contracts, and perhaps as many as twenty different carloads of wheat had thus been shipped by the plaintiff to the defendants, yet according to the statement of Mortimer Pollock not a single carload had ever been unloaded on the platform either before or after the institution of this suit. But in every instance the wheat had been unloaded directly from the car into the wagons of the defendants. This defendant, while admitting that they always unloaded the car from the switch and never had it unloaded on the platform, yet says that this was done " for the accommodation of the railroad to save them labor." Doubtless it did save the company labor, but it would seem quite obvious, that the defendants too were saved labor by thus transferring the wheat directly from the cars in their wagons instead of having it first unloaded on the platform and from there loading it into their wagons. Indeed there was so much labor saved to the defendants, that they unloaded the cars themselves instead of requiring it of the company as they could have done. This defendant in his testimony does not seem to think that they were accommodating the plaintiff by unloading the car themselves but that the accommodation was to the railroad company, who, as we shall presently see, as common carriers were bound to unload their own cars. On the contrary this defendant in his testimony says on cross-examination, that " after the arrival of the wheat at Wheeling there was nothing that Mr. Bloyd, the plaintiff, would have to do." The conclusion seems therefore inevitable, that, if we look only to the testimony of Mortimer Pollock, the real contract and understanding was, that the wheat was not to be delivered by the plaintiff on the platform at the depot in Wheeling but on the cars at the depot in Wheeling. Nor can this conclusion be rendered even questionable by the fact, that, though the defendant, Mortimer Pollock, persistently insisted, that the wheat was to be delivered on the depot at Wheeling, yet in his testimony he said he construed this to mean that he was to unload the wheat on the platform of the depot at Wheeling.

But he is not even consistent in so construing these contracts. For, when on cross-examination he is asked; " Do

you undertake to say that Mr. Bloyd the plaintiff was to unload that wheat here, in Wheeling under your contract with him ?" he answered : " No, sir, I don't undertake to say anything of the kind." But when this question is subsequently repeated he changes his answer. The question is then propounded in this form : " You then did not understand that Mr. Bloyd the plaintiff was to unload the wheat out of the car when it arrived here ?" He answered : " Well, when we say on the depot in Wheeling, of course we mean that the wheat be brought there and put on the depot. That is the contract." When asked : " Do you mean by that, that he is to unload the wheat there ?" he answers : " Yes, sir," and afterwards adds : ·" That is what we contracted for in this case at the time we entered into the contract." This was obviously a construction placed on the contract by the witness while being examined, and. is a construction inconsistent with one placed upon it perhaps twenty times in unloading the cars themselves, and one about which he seems even while being examined to be wavering and fickle, and for these reasons entitled to no consideration. It seems to me, that by his testimony the contract was, that the wheat was to be delivered at the depot in Wheeling, that is, as we shall presently see, on the cars at the depot in Wheeling, which is what the plaintiff testifies it was. So that really there was no conflict in the testimony as to where the wheat was to be be delivered. If any one could consider there was any evidence, which taken by itself tended to prove, that this wheat was to be delivered either on the depot or on the platform of the depot, all, it seems to me, must regard it as so weak, that if the jury had based a verdict on either of these hypothesis as facts, it would have been the duty of the court to set it aside, as contrary clearly to the overwhelming weight of the evidence.

We will next consider, whether this wheat was in point of fact " delivered by the plaintiff to the defendants at the depot in Wheeling or on the cars at the depot in Wheeling ?" The counsel for the plaintiffs in error, the defendants below, insist, that as the Baltimore and Ohio Railroad Company did not deliver this wheat to them it follows that we can not consider, that the plaintiff below, the defendant

in error, ever delivered this wheat to them as required to do by the contract, the obligation of the railroad company and the defendant as to delivering being the same.

I will first examine the premises in the position of counsel and then the conclusion drawn from these premises. Are these premises true? The agents of the Baltimore and Ohio Railroad Company say they are not; they assert that when the Baltimore and Ohio Railroad Company by its agents placed this carload of wheat on a switch of the railroad near the depot in Wheeling, February 6, 1884, about ten o'clock, in order that the defendants might unload it, as they had always been accustomed to do, they by that act delivered this carload of wheat to the defendants. Is this true? The fact, that the car was at that time placed on the switch, that it might be conveniently unloaded by the defendants, and the further fact, that the defendants had been accustomed to unload cars consigned to them, which had been placed on this switch, are undisputed and are unquestionably true. But are the agents of the company justified in calling this a delivery of the wheat to the defendants? The Baltimore and Ohio Railroad Company is a common carrier, coming directly within the definition of a common carrier, which is, one whose businsss it is to carry chattels for all persons, who may choose to employ and remunerate him. And as a common carrier the company is responsible for all loss or damage during transportation from whatever cause except the act of God or the public enemy. The responsibility of the common carrier as such begins upon the delivery of the goods for immediate transportation; and a delivery at the usual place of receiving freight or to the employes of the common carrier in the usual place of business is sufficient. (*Merriam* v. *The Hartford and New Haven Railroad Company*, 20 Conn. 354.) But when the carrier has a warehouse where he receives goods for transportation, and goods are delivered there not to be forwarded, till ordered by the owner, or till some event occurs, the carrier in the meantime is only responsible as a depositary. (*Spade* v. *The Hudson River Railroad Company*, 16 Barb. 383; *Moses* v. *The Boston and Maine Railroad*, 24 N. H. 71.)

But there is much greater difficulty in determining where

·the responsibility of a common carrier as such terminates. A common carrier is bound to deliver the goods to the consignee personally, and the delivery required is an actual transfer of the possession of the goods. (*Golden* v. *Manning*, 2 W. Blacks. 916; S. C. 3 Wils. 425–33; *Stoer* v. *Crowley*, 1 McCle. & Yo. 129; *Hyde* v. *Trent, &c. Co.*, 5 T. R. 389; *Smith* v. *Home*, 8 Taunt. 144; *Wardell* v. *Mowrillyan*, 2 Esp. 693; *Bodenham* v. *Bennet*, 4 Pr. 31; *Eagle* v. *White*, 6 Whar. 505; *Garnett* v. *Williams*, 3 Barn. & Ald. 53; *Duff* v. *Budd*, 3 B. & B. 177; *Gibson* v. *Calver*, 17 Wend. 306; *Ostrander* v. *Brown*, 15 Johns. 39; *Fisk* v. *Newton*, 1 Denio 47; *Adams* v. *Blackenstein*, 2 Cal. 413; *Bartlett* v. *Steamboat Philadelphia*, 32 Mo. 56.) But this mode of delivery being very inconvenient to common carriers a question arose, whether this personal delivery to the consignee of the actual possession of the goods was required of a common carrier by water, or whether in lieu of it there should not be substituted a delivery of the goods by the common carrier on the wharf, or more properly speaking, whether the law ought not to excuse the common carrier by water from delivering the goods to the consignee in person, if he was not at the wharf, when the goods arrived there, as the wharf must have been impliedly considered as the place of delivery agreed upon by the parties. It was contended by able judges that a common carrier by water as well as' a common carrier by land must deliver the goods personally to the consignee at his place of business. (*Hyde* v. *Trent and Mersey Navigation Company*, 5 T. R. 394, *et seq.*) No conclusion on this point was reached in that case. But it may be considered as settled by the subsequent cases, that a carrier by water is not bound to deliver the goods to the consignee personally by an actual transfer of the possession of the goods to him at his place of business, but that in lieu thereof he may place the goods on the wharf and give notice thereof to the consignee retaining possession and care of them for such reasonable time, as would be necessary for the consignee to come for his goods and receive them of the common carrier. If this be done by the common carrier his responsibility as a common carrier for the safety of the goods will terminate at the expiration of such reasonable time, and after such reasonable time he

will hold the goods not as common carrier but only as a depositary. (*Galliffe* v. *Bourne*, 4 Bing. N. C. 371–373; S. C., 3 Man. & G. 687; *Syeds* v. *Hay*, 4 T. R. 260; *Ostrander* v. *Brown*, 15 Johns. 42; *Cop* v. *Cordova*, 1 Rawle 210; *Fisher* v. *Newton*, 1 Denio 57; *Union Steamboat Company* v. *Knapp*, 73 Ill. 507–8.)

When railroads became the common mode of transporting goods, the question arose whether there should be applied to the railroad companies, who were unquestionably common carriers, when determining their duties as such in reference to the delivery of goods to the consignee, the same rule, which had been applied to other common carriers by land, and place them under obligation to deliver the goods to the consignee personally at his place of business, or whether from the necessity of the case they should not be permitted to perform this duty by what was sometimes improperly called a constructive delivery, as carriers by water had been allowed to do, that is, by unloading the goods transported at the terminus of the route, over which they undertook to transport them, and then give to the consignee notice that they held the goods ready for delivery when called upon by the consignee; and after a reasonable time had transpired, in which the consignee might demand the personal delivery of the goods, the railroad company ought, just as the common carrier by water is, to be held relieved from all responsibility as common carrier, and be held responsible for the safety of the goods thereafter as a depositary, or whether a still more liberal rule ought not to be adopted. This still more liberal rule proposed was, that the liability of the railroad companies as common carriers should be considered as ended, when they have unloaded the cars and deposited the goods in their warehouse; and that thereafter they should be held responsible for the safety of the goods only as warehousemen or as wharfingers, when the loss or injury of the goods arose from their want of ordinary care.

This last was the rule adopted in Massachusetts; and as the reasons for adopting it are expressed by Chief Justice Shaw with great clearness in *The Norway Plains Company* v. *Boston and Marine Railroad*, 1 Gray 244, I propose to give them, adopting his language. He says on page 270:

"The question then is, when and by what act the transit of the goods terminated. It was contended in the present case, that in the absence of express proof of contract or usage to the contrary, the carrier of goods by land is bound to deliver them to the consignee, and that his obligation as carrier does not cease till such delivery. This rule applies, and may very properly apply, to the case of goods transported by wagons and other vehicles, traversing the common highways and streets, and which therefore can deliver the goods at the houses of the respective consignees. But it can not apply to railroads, whose line of movement and point of termination are locally fixed. The nature of the transportation, though on land, is much more like that at sea, in this respect, that from the very nature of the case, the merchandise can only be transported along one line, and delivered at its termination, or at some fixed place by its side at some intermediate point. The rule in regard to ships is very exactly stated in the opinion of Butler, Judge, in *Hyde and Trent* v. *Mersey Navigation Company*, 5 T. R. 387. 'A ship trading from one port to another has not the means of carrying the goods on land; and according to the established code of trade, a delivery on the usual wharf is such a delivery as will discharge the carrier.'"

I would remark with reference to this reasoning, that it is entirely sound except that there is an error in stating the rule in regard to ships, the rule being, as we have seen, that a delivery on the usual wharf will discharge the carrier, provided he has given notice to the consignee of the arrival of the goods at the wharf and his readiness to deliver them when called for; for, as the wharf was the place of delivery impliedly agreed upon, if the consignee after notice of the arrival of the goods at the wharf fails to go or send for them, he thereby prevents the common carrier from fulfilling his contract to deliver to the consignee in person, and therefore the common carrier as such is discharged of this obligation. All the courts agree that railroad companies like the owners of ships need not deliver the goods, which they transport, to the consignees personally at their place of business. But many of the courts differing from Chief Justice Shaw in this opinion require of the railroad companies, as they do of

ship-owners, that, if they would discharge themselves from their responsibilities as common carriers, they must give to the consignees of goods notice of the arrival of their goods at the depot or wharf. The reasons, why this rule, requiring railroad companies to give notice to the consignee of the arrival of the goods, before they can terminate their liability as common carriers, should not be adopted, are those given by Chief Justice Shaw, pages 274-5 :

"It was argued in the present case that railroad companies are responsible as common carriers of goods, until they have given notice to consignees, of the arrival of goods. The court is strongly inclined to the opinion, that in regard to the transportation of goods by railroad, as the business is generally conducted in this country, this rule does not apply. The immediate and safe storage of goods on arrival, in warehouses provided by the railroad company, and without additional expense, seems to be a substitute better adapted to the convenience of both parties. The arrival of goods, at large places to which goods are thus sent, are so numerous, frequent, and various in kind, that it would render it nearly impossible to send special notice to each consignee, of each parcel of goods, or single article forwarded by the trains.    *    *    *    It also seems to be the practice, for persons forwarding goods to give notice by letter and enclose the railroad's receipt, in the nature of a bill of lading, to the consignee or an agent to warn him to be ready to receive them. This renders notice not essential."

These views of Chief Justice Shaw are well met in my opinion by Cooley J. in *McMillan et al* v. *Michigan Southern R. R. Co.*, 16 Mich. 106, where he says :

"If the road has no warehouses, the cars must remain standing on the track until the owners can come and receive their goods, or if they are unloaded, the company must not only establish a watch to prevent thefts, but at their peril must protect against injuries by the elements. Landing the goods on the platform, it is agreed on all hands, does not alone discharge the carrier. And it seems to me that a consideration of the immense carrying trade of the country will force one to the conclusion that it can not possibly be either properly, expeditiously, or profitably done except with the conveniences afforded by the railroad ware-

houses, which afford the easiest, cheapest and most effective means by which carriers are enabled to protect *themselves* against losses in that capacity. * * * Only by means of warehouses can railroad companies keep their tracks clear for trains or protect against the destruction of goods of which they are insurers. * * * In every view therefore they seem indispensible to the business of the carrier: and being constructed with reference to it, they are properly nothing more than an extention of the platforms upon which the companies receive and deliver goods, with walls and roofs added to facilitate delivery and guard and to protect against injuries by the elements. The interest on the other hand, which the consignee has in the warehouses, is much less direct and important. It may facilitate the delivery of goods, but the carrier is liable if he fails to deliver them in a reasonable time. The risk of loss and injury will be less, but against that the carrier insures. In no proper sense can the warehouses be said to be for his accommodation: And if the obligations of the carrier to him are diminished by its erection, he might well prefer it should not be built. The rule which changes the carrier to a warehouseman against the will of the owner of the property, on the ground solely that he has erected convenient structures for the storage, but which structures are absolutely essential to his business as carrier, seems to me to be a departure from the rule of the common law, upon reasons which do not warrant it. It is a rule which allows the insurer to absolve himself from obligations to the insured, by supplying himself with conveniences for the transaction of his business, and with the means of protection against loss and damages."

This seems to me a conclusive reason, admitting that carriers by water and railroads are still responsible as carriers, though they have deposited the goods on the wharf or railroad platform, why railroad companies should not be allowed to discharge themselves from their responsibility as carriers and as such insurers, until they have given to the owner of the goods an opportunity to get them, by notifying him of their arrival, any more than the carrier by water can discharge himself of his liability, as carrier, till he has given such notice. If the railroad companies should be allowed to

change its responsibility to the much less onerous one of wharfinger without either the knowledge or assent of the owner of the goods by simply placing the goods in a warehouse erected by the railroad company as a necessary structure to enable them to carry on profitably their business as carriers, it seems to me, every principle of justice would be violated. The railroad company, after it has placed the goods in its warehouse or even before, if it choses, can terminate its responsibility as a common carrier simply by giving to the consignee of the goods notice of their arrival. If he does not call for them in a reasonable time, it is just to re-regard him as assenting that the railroad company may hold them as wharfingers or depositaries; but without assent, express or implied, it is unreasonable to permit the railroad company to become a wharfinger of his goods; which he generally does not want kept in a warehouse but would like to have delivered at once, and the delivery of which he would at once demand if he was notified of their arrival.

And the fact, that notice is now required by law and, I presume, is given by railroad companies in some of the largest cities in the United States, shows that Chief Justice Shaw was mistaken, when he said: "The arrival of goods at larger places, to which goods are thus sent, are so numerous, frequent, and various in kind, that it would be nearly impossible to send special notice to each consignee of each parcel of goods or single article forwarded by the trains." Special instances do occur, where it is impossible, or nearly so, to give such special notice, and then perhaps the railroads may be excused from so doing. In some of the States, where this reasonable notice of the arrival of the goods at the depot is not required to be given to the consignee, before the railroad company can discharge itself of its liability as a common carrier, they have held, that the simple placing of the goods in the warehouse will not discharge the company of its liability as carrier, but assuming that the consignee informed himself promptly of the arrival of the goods at the depot without any notice being given him, he must nevertheless be afforded a reasonable opportunity during the hours, when such goods are usually delivered from the freight-house of the railroad company to examine them and take them away.

This modification of the rule laid down by Chief Justice Shaw, which we have been discussing, was made by the supreme court of New Hampshire in *Morris* v. *Boston and Maine Railroad*, 32 N. H. 523. The reasons which controlled the court are given at length by Sawyer, judge, in delivering the opinion of the court. I will give in his own language so much, as will clearly show the views of the court. On page 538 *et seq.* he says,

"That it is the duty of the consignee to come for his goods is clear, but it would be quite as impracticable for him to be at the place of delivery at the moment of their arrival, or of their being unloaded from the cars, without actual notice to him of their arrival, as it would be for the company to diverge from their line of road in order to deliver them at his place of business, or to send notice to him on their arrival, before proceeding to unload them. The arrival may be in the night, or after the expiration of business hours at the station, or at so late a period before it as to render it impossible for him to get them away within the hours of business.

" If under such circumstances they have been removed from the cars and placed in the warehouse, it can not be said that they are so placed and kept there until the gates are opened, and business resumed on the following day, for any purpose having reference to the convenience and accommodation of the owner or consignee, nor can the proceeding on any sound view be considered as equivalent to a delivery. The same persons—the servants of the company—continue in the exclusive possession and control of the goods as when they were on their transit, and they are equally shut up from the observation and oversight of all others. The consignee has had no opportunity to know that they have arrived and in what condition, and is in no better condition to disprove the fact, or to question any account the servants of the company having them in charge may choose to give of what may have happened to them after they have been removed from the cars or prior thereto, than they were before such removal." * * * * So that the same broad principles of public policy and convenience upon which the common law liability of the carrier is made to rest, have equal application after the goods are removed to the warehouse as before, until

the owner or consignee can have the opportunity of examining their condition and taking them away; and the same necessity exists for encouraging the fidelity, and stimulating the care and diligence of those who thus continue to retain them in charge, by holding that they shall continue subject to the risk.

"It is no satisfactory answer to this view to say that the company, having provided a warehouse in which to store the goods for the accommodation of the owner, after the transit has terminated, may be regarded, by their act of depositing them in the warehouse, as having delivered them from themselves as carriers to themselves as warehousemen. The question is still, when, having a proper regard to the principles which lie at the basis of their carrier liability, and to the protection and security of the owner, can this transmutation of the character in which they hold the goods be said to take place, and this constructive delivery to be made. If this be held to be at any point of time before there can be an opportunity to take them from the hands of the company, then may the owner be compelled to leave them in their possession under the limited liability of depositaries or bailees for here, contrary to his intention and without any act or neglect on his part which may be considered as indicating his consent thereto. It may have been his intention to take them from their possession at the earliest practicable moment, for the reason that he may not be disposed to entrust them to their fidelity and care without the stimulus to the utmost diligence and good faith afforded by the strict liability of carriers. If he neglects to take them away upon the first opportunity that he has to do it, he may be said thereby to have consented, that they shall remain under the more limited responsibility. But upon no just ground can this consent be presumed when his only alternative is to be at the station where they are to be delivered at the arrival of the train, at whatever hour that may happen to be, whether in the night or the day, in or out of business hours, and regardless of all the contingencies upon which the regularity of its arrival may depend.

"It is to be supposed that the consignee has been advised by the consignor of the fact that the goods had been forwarded,

and that he has taken or is prepared to take proper measures to look for them upon their arrival, and to remove as soon as he can have reasonable opportunity to do so. It must be supposed, too, that he is informed of the usual course of business on the part of the company, and of their agents, of the hours established for the arrival of the trains, and of unloading the cars and delivering out goods of that description, and that he will exercise reasonable diligence in reference to all these particulars, to be at the place of delivery as soon as may be practicable after their arrival, and take them into his possession.

"The extent of the reasonable opportunity to be afforded him for that purpose is not, however, to be measured by any peculiar circumstances of his own condition and situation, rendering it necessary for his own convenience and accommodation that he should have longer time or better opportunity than if he resided in the vicinity of the warehouse, and was prepared with the means and facilities for taking the goods away. If his particular circumstances required a more extended opportunity, the goods must be considered after such reasonable time as but for those peculiar circumstances would be deemed sufficient to be kept by the company for his convenience, and under the responsibility of depositaries or bailees for him only. * * * * * We are aware that this view of the liability of railroad companies as carriers conflicts with the opinion of the supreme court of Massachusetts, as pronounced by the learned chief justice of that court in the recent case of *Norway Plains Co.* v. *Boston & Maine Railroad*, 1 Gray 263. In that case it was held that their liability as carriers ceases when the goods are removed from the cars and placed upon the platform of the depot, ready for delivery, whether it be done in the day-time or in the night —in or out of the usual business hours—and consequently irrespective of the question whether the consignee has or not an opportunity to remove them. The ground upon which the decision is based would seem to be the propriety of establishing a rule of duty for this class of carriers of a plain, precise and practicable character, and of easy application, rather than adhering to the rigorous principles of the common law. That the rule adopted in that case is of this character

is not to be doubted; but with all our respect for the eminent judge by whom the opinion was delivered, and for the learned court whose judgment he pronounced, we can not but think that by it the salutary and approved principles of the common law are sacrificial to considerations of convenience and expediency, in the simplicity and precise and practicable character of the rule which it establishes."

I do not doubt that the New Hampshire supreme court wisely added to the rule laid down by the Massachusetts supreme court, that a railroad company, whether it has placed the goods in its warehouse or not, can not be discharged of its common law liability as carrier until the consignee has had a reasonable opportunity during the hours, when such goods are usually delivered from their warehouse, to examine their condition and take them away. And the reasons assigned by Judge Sawyer seem to me entirely satisfactory. But even when thus modified the rule seems to me unsatisfactory, as it fails to require of the railroad company to give any actual notice to the consignee of the arrival of the goods at the depot. The question, whether it was necessary for a railroad company in order to relieve itself of its liability as a common carrier to give notice to the consignee of the arrival of the goods at the depot, is not discussed in the New Hampshire case. It is assumed that it is not; and this assumption was no doubt based upon the decision and opinion rendered in *Norway Plains Co.* v. *Boston & Maine Railroad*, 1 Gray 263.

From the opinion rendered in the New Hampshire case we infer, that the assumption, that in order to relieve itself of liability as a common carrier it was not necessary for a railroad company to give the consignee of the goods any notice of their arrival, was based on two grounds: one, that the "railroad company had provided a warehouse, in which to store the goods for the accommodation of the owner;" the other, "that the consignee is to be supposed to have been advised by the consignor of the fact, that the goods had been forwarded," and therefore it became his duty to take notice of the general course of business of the carrier, the time of the arrival of trains, and when the receipt of the goods might be expected, and to be on hand and ready to take them away in a reasonable time after their arrival. In this decision

it is assumed to be simply a question of reasonable diligence with the consignee, whether he ascertains the arrival of the goods at the depot or not, and that the regularity of the trains is such as to leave him without reasonable excuse if he fail to inform himself. But on most of our railroads such regularity in the running of freight-trains does not exist and is quite impracticable. Therefore this second reason for not requiring notice of the arrival of the goods to be given to the consignee, as is required of carriers by water, is not a sufficient reason.

The first one is still more unsound, as it is not true as assumed, that "railroad companies provide warehouses, in which to store goods for the accommodation of the owner." On the contrary, as we have seen, railroad companies provide warehouses, because "they are indispensible to the carrying on of their business as common carriers. Accordingly instead of the rules we have stated adopted by the courts in Massachusetts and New Hampshire in other states the rule adopted has been : "That the liability of the carrier continues until the consignee has been notified of the receipt of the goods and has had reasonable time in the common course of business to take them away after such notification."

The reasons for this rule are set forth with great perspicuity by Judge Cooley in *McMillan* v. *Michigan Southern Railroad Co.*, 16 Mich. 102 *et seq.* Judge Cooley there lays down three distinct rules or views, which had been taken by the courts : First. When the transit is ended, and the carrier has placed the goods in his warehouse to await delivery to the consignee, his liability as carrier has ended also, and he is responsible as warehouseman only. Second. Merely placing the goods in the warehouse does not discharge the carrier, but he remains liable as such, until the consignee has had reasonable time after their arrival to inspect them and take them away in the course of business. Third. The liability of the common carrier continues, until the consignee has been notified of the receipt of the goods and has had reasonable time after such notification in the common course of business to take them away. In the progress of the case he seems to me to satisfactorily answer the grounds, upon which it was assumed in *Moses* v, *Boston and Maine*

*Railroad*, that no such notice was necessary.  I have already quoted that part of his opinion, which, seems to me to be a satisfactory answer to this assertion, so far as it is based on the assumption that "railroads prepare warehouses, in which to store the goods for the accommodation of the owners." I will now quote such part of his opinion, as is, I think, a satisfactory answer to the position assumed in this New Hampshire case, that no notice was necessary, because it would be assumed, that the consignor had by letter notified the consignee of the shipment, and the consignee knew the time of the arrival of the freight-trains and was therefore without reasonable excuse, if he failed to inform himself of the goods consigned to him, and needed no notice of the time of their actual arrival.

On page 104 Judge Cooley says :   "If the business is not so great but that the freight-trains can be run with the same regularity as those for passengers, and the freight can always be sent forward immediately on being received for the purpose, a notice from the consignor will usually apprise the consignee with sufficient certainty when the goods may be expected.   But on the long through lines such regularity is quite impracticable.   Freight must be sent forward from the carrier's warehouse with a promptness depending upon the pressure of business; or in other words as it may suit his convenience and interest to forward it.   This may be many days or even weeks or it may be immediately.   It is not always in the power of the carrier to give reliable information on the subject, and unavoidable delay will frequently interfere after the transit has commenced.   To require the consignee to watch from day to day the arrival of trains, and to renew his inquiries respecting the consignment, seems to me imposing a burden upon him without in the least relieving the carrier.   For it can hardly be doubted that it would be less burdensome to the carrier to be required to give notice than to be subjected to the numberless inquiries and examinations of his books which would otherwise be necessary especially at important points.

"The rule that the liability of the carrier shall continue until the consignee has had reasonable time after notification to take away his goods is traceable to certain English decis-

ious having reference to carriers by water, whose mode of doing business resembles that of railroad companies in ability to proceed with their vehicles to every man's door and there deliver his goods. It is a modification in favor of the carrier by land of the obligation formerly resting upon him, and which required, in the absence of special contract, an actual delivery to the consignee of the goods carried. The modern modes of transportation render this impracticable, unless the carrier shall add to his business, that of drayman also, which is generally a distinct employment. In lieu of delivery, therefore the carrier is allowed to discharge himself of his extraordinary liability by notifying the consignee of the receipt of the goods, who is then expected, in accordance with an almost universal custom, to remove them himself. It is insisted however, that this rule, so far as it can be considered as established by authority, is applicable only to carriers who have no warehouses of their own, but make the wharf or platform their place of delivery, and who therefore never become warehousemen, and are held to a continued liability as carriers, as the only mode of insuring watch and protection over the goods until the owner can have an opportunity to receive them. This distinction would not be entirely without force, and would seem to be acted upon in one State at least. *Comparee Scholes* v. *Arckerland*, 13 Ill. 574 and *Crawford* v. *Clark*, 15 Ill. 561, with *Richards* v. *M. S. & N. J. R. R. Co.*, 20 Ill. 404, and *Porter* v. *Same*, 20 Ill. 407. See also *Chicago & R. I. R. R. Co.* v. *Warren*, Ill. 502 where a railroad company was held to the same measure of responsibility as a carrier by water, where the property carried, instead of being placed in their warehouse, was left outside. It may well be doubted whether this distinction rests upon sufficient reason. * * * * * As what the consignee desires is not for his goods to remain in store, but to receive them personally as soon as they can be carried and the railroad company, if they had no warehouse would continue to be liable as carriers until the lapse of a reasonable time after notification, it would seem that if the company can claim any exemption from their liability as insurers, it must be upon the ground that the erection of warehouses is for the benefit not of the company, but of the public doing business with them, and to facilitate delivery."

He then proceeds in the manner hereinbefore stated to show that this is not the case.

So far as my examinations go, the following are the authorities sustaining this first view, viz : "When the transit is ended and the carrier has placed the goods in his warehouse to await delivery to the consignee, his liability as carrier is ended also, and he is responsible as warehouseman only." *Thomas* v. *Boston and Providence Railroad Company*, 10 Md. 472; *Norway Plains Co.* v. *Boston and Maine Railroad Co.*, 1 Gray 270; *Francis* v. *Dubuque & Sioux City Railroad Co.*, 25 Iowa 60; *Jackson* v. *Sacramento Valley Railroad Co.*, 23 Cal. 268; *Illinois Central Railroad Co.* v. *Alexander* 20 Ill. 23 ; *C. E. Neal & Co.* v. *Wilmington & Weldon Railroad Co.*, 8 N. C. 482. *The Cincinnati & Chicago Air Line Railroad Co.*, v. *Mc Cool*, 26 Ind. 140 ; *Mc Curty et al* v. *The New York & Eire Railroad Co.* 30 Pa. St. 247 ; *Porter* v. *The Chicago & Rock Island Railroad Co.* Ill. 407 *Mote* v. *The Chicago & Northwestern Railroad Co.*, 27 Iowa 22; *Hilliard* v. *Wilmington & Weldon Railroad Co.*, 6 Jones N. C. 343, and Judge Campbell's opinion in *Mc Millan* v. *Michigan Southern Railroad Co.*, 16 Mich. 123. The arguments in favor of this view are strongly presented in the opinion of Campbell, Judge, in the last case.

The following authorities sustain the second of these views, viz : "Merely placing the goods in the warehouse does not discharge the carrier ; but he remains liable as such, until the consignee has had reasonable time after their arrival to inspect and take them away in the common course of business :" *Moses* v. *Boston and Maine Railroad Co.*, 32 N. H. 523; *Blumenthal* v. *Brainerd*, 38 Vt. 413; *Morris & Essex Railroad Co.* v. *Ayres*, 5 Dutch. 393 ; *Wood* v. *Crocker*, 18 Wis. 345 ; *Winslow* v. *Vermont & Mass. Railroad Co.*, 42 Vt. 705 ; *Alabama Railroad Company* v. *Kidd*, 35 Ala. 209. And among the text writers Redfield. (See his work on Carriers and other Bailees, sec. 110.) In reaching the conclusion that it is not necessary for the railroad company to give the consignee notice of their arrival at the depot of the goods he appears to have been much influenced by the opinion of Chief Justice Shaw in *The Norway Plains Co.* v. *The Boston & Maine Railway*, 1 Gray 266, of whom he justly says : "He has perhaps no superior upon this continent, as a

wise and just expositor of the law as a living and advancing study. (See sec. 111.) The following authorities support the third view, viz: "The liability of the carrier continues until the consignee has been notified of the receipt of the goods and has had reasonable time in the common course of business to get them away after notification:" *Hedges* v. *Hudson River Railroad Co.*, 6 Rob. (N. Y.) 120; *Solomon* v. *Philadelphia & New York Express Steamboat Co.*, 2 Daly 104; *Browning* v. *Long Island Railroad Co*, 2 Daly 117; *Lamb* v. *Camden & Amboy Railroad Co.*, 2 Daly 454; *McDonald* v. *Western Railroad Co.*, 34 N. Y. 497; *Fenner* v. *Buffalo and State Line Railroad Co.*, 44 N. Y. 505; *Buckley* v. *Great Western Railroad Co.*, 18 Mich. 121; *Fenner* v. *Buffalo, &c., Railroad Co.*, 46 Barb. 103; *Rome Railroad Co.* v. *Sullivan*, 14 Ga. 277; *Dean* v. *Vaccaro & Co.*, 2 Head. Tenn. 488; *Baltimore & Ohio Railroad Co.* v. *Morehead*, 5 W. Va. 300; and the text writers generally. See Angel on Carriers, secs. 313, 295, 298 and 319; 2 Parsons on Contracts, p. 190; Wade on Notices, secs. 570, 571 and 573.

The reasons, on which these views are based, are presented in the strongest form by Judge Cooley in his opinion in the case of *McMillan* v. *Michigan Southern Railroad Co.*, 16 Mich. 103. Wade in his "Law of Notices," approves the reasoning of Judge Cooley in this case. (Sec. 573.) Parsons in his work on Contracts, Vol. 2, sec. 9, p. 190, says: "It is usual for railroads not to send the goods out of their depots. There is perhaps no objection to this usage strengthening itself into law. But we think in that case the railroad-carrier should give notice forthwith on the arrival of the goods to the consignee, if his residence is known, or can be found by any reasonable exertion. We think the law should make this requirement, and this so positively that no usage against it should be permitted to control the law; at least not unless it was quite universal and well known to all, and there is some disposition to hold the law thus."

I have reviewed quite fully the decisions of the courts and the views of the law-writers on the question of what acts of railroad companies will terminate their responsibilities as common carriers; and when their responsibilities as such will terminate, if they do no act, after the goods have arrived

at the terminus of the route to which they were consigned. It will be at once seen that the authorities are very conflicting, and that it is impossible to reconcile them. But this conflict will be diminished somewhat, if we bear in mind, that in determining what is a sufficient delivery of goods by a carrier, or what will discharge the carrier from his obligation to deliver, usage has frequently great influence; and usage in reference thereto may be so long established, so uniform and so well known, that it must be supposed that the parties to the contract knew it and contracted with reference to it, and that it became, as it were, a part of the contract, and as such might modify the duties of a common carrier in reference to the delivery of the goods in an important manner. (*Farmers' and Mechanics' Bank* v. *Chaplain Transportation Co.*, 16 Vt. 52; 18 Vt. 131; 23 Vt. 186.) But after making all proper allowance for different usages in different localities the authorities will remain irreconcilable; and we must then follow our own reason aided, as it will be, by suggestions contained in many of these decisions.

In undertaking as briefly as we can to express our views, we must be understood as giving our views of the law when the contract with the carrier is unaffected by any local usage. We will also give briefly the reasons, which lead us to the conclusions we reach.

As the liability of every common carrier begins with the delivery by actual transfer of possession of the goods to him for immediate transportation, so it continues until the delivery by him by actual transfer of possession of the goods to the consignee or his agent at the place of delivery agreed upon. But if the carrier agrees to transport the goods to a designated place and then deliver them to the consignee or his agent in person by actually putting the goods into his corporal possession, it is obvious that, if the consignee absents himself from the designated place of delivery and has no agent there, he renders it impossible for the carrier to make such delivery as his contract requires him to make. And this inability of the carrier to comply with his contract, if intentionally caused by the act of the consignee, must relieve the carrier from his obligations as carrier to deliver the goods. This conclusion, the necessary result of the contract which

the carrier enters into, is obviously applicable equally to common carriers by land, as formerly conducted in wagons and other like vehicles, to carriers by water in boats, ships and like craft and to carriers by railroads in cars.

When this principle is applied to any one of these several kinds of common carriers, it ought to lead to results corresponding with the decisions of our courts with reference to the responsibility of these several kinds of common carriers as to the delivery of goods put in their hands as carriers to transport. Let us first apply this principle to the case of a common carrier by wagons, stage-coaches or some other like vehicle. The consignor places in the possession of such a carrier goods to be transported and delivered to the consignee. Nothing is generally said about the place of delivery. As a matter of course the implied understanding is that the goods are to be delivered either at the residence of the consignee or at his place of business according to the character of the goods to be delivered. In such case a person found at the residence of the consignee or at his usual place of business may usually be regarded as the agent of the consignee to receive the goods, and the goods must be delivered personally to such agent or to the consignee at his residence or at his usual place of business, as the case may be. This position is established by the authorities hereinbefore cited to establish that there must be a personal delivery of the goods by the carrier to the consignee, in order that he may be relieved herein of his responsibility as carrier. Upon this point Chancellor Kent in his Commentaries says (Vol. 2, p. 605): "In *Hyde* v. *Trent & Mersey Navigation Co.*, 5 Term R. 389, it was much discussed whether the carrier was bound to deliver to the individual at his house or whether he discharged himself by delivery to a porter at the inn in the place of destination. The opinion of a majority of the court (though there was no decision on the point) was that the risk of the carrier continued until a personal delivery at the house of the consignee or at the place of deposit (the inn), with notice. The actual delivery to the proper person is generally conceded to be the duty of the carrier." The law strictly requires a common carrier to fulfill exactly his duty and will allow few excuses for its non-performance, and this delivery of the goods per-

sonally by the carrier to the consignee or his agent is no exception to the general rule.  (*Stephenson* v. *Hart*, 4 Bing. 476; *Sanguer* v. *The London & Southwestern Railway Co.*, 32 Eng. Law & Eq. 338; *Duff* v. *Budd*, 3 Bro. & Bing. 117). These cases show that the common carrier will not be excused, because he has innocently by mistake or misled by imposition delivered goods to the wrong person, even though he may have used diligence to ascertain the proper person. If the place at which the goods are to be delivered is specified, a common carrier of the kind of which we are now speaking is bound to deliver the goods at such place personally to the consignee, if found there, or if not, he is bound to give the consignee notice of the arrival at the designated place in a reasonable time, and till this is done, the carrier remains responsible for such goods as carrier.  Thus in *Golden* v. *Manning & Peyton*, 3 Wilson 433 the court says:

" There can be no doubt but carriers are obliged to send notice to persons to whom goods are directed on the arrival of those goods within a reasonable time, and must take special care that the goods be delivered to the right person.  * * * The master of a stage-coach takes a greater price for the carriage of goods than other carriers, and so is certainly bound to either send out the goods from the warehouse in London to be delivered to the persons, to whom the same are directed, or to send notice of the arrival thereof within a reasonable time."

The reason why notice was regarded as dispensing with the actual delivery to the consignee is, that the contract not being to deliver it at the residence of the consignee, and he not being at the designated place for the delivery, the contract could not be literally performed by the carrier, unless the consignee came to the place of delivery; and if he neglected to do so, after he was notified of the arrival of the goods, the carrier through the fault of the consignee being unable to deliver the goods, as he contracted to do, would be excused from the performance of his obligation as a common carrier, though of course he would be responsible for the goods still and required to take care of them as a depositary or one having the possession of the goods of another; but his responsibility as such depositary would be far different

from his responsibility as a common carrier, who was an insurer except against the acts of God or of the public enemy.

Precisely the same principles, which were applied to common carriers by wagons or stage, were applied to common carriers by water. The difference between these two kinds of common carriers was that ordinarily the place of the delivery of the goods was not specially named in the case of these common carriers by land and was construed to be as of course the residence or place of business of the consignee, but in the case of the common carriers by water their vehicles being boats could not go to the residence of the consignee, and if the contract designated no particular place in the town, to which the goods were to be conveyed, the place of delivery to the consignee was very properly construed to be the wharf. And by the rules above laid down the carrier would be bound to deliver the goods at the wharf to the consignee or his agent. This he could not do, unless the consignee or his agent was there to receive them; and the law excused the carrier from the performance of this duty, if after being notified by the carrier of the arrival of the goods the consignee failed to come or send for them. Though the common law was very strict in requiring the performance of all the duties it imposed on the common carrier and would, as we have seen, rarely receive any excuse for his failure to perform such duty, yet as he could not deliver the goods at the wharf to the consignee, as his contract required him to do, if the consignee having been notified of their being at the wharf and ready for delivery refused or neglected to come or send for them, and this inability of the carrier to perform his contract with reference to the delivery being caused by the refusal or neglect of the consignee to come for them, after he was notified, he could get them by coming to the place, where they were to be delivered, the courts however strict, could not but excuse the common carrier for not making such delivery. Accordingly this may be regarded as well settled law as shown by the authorities, which we have hereinbefore cited on this point. These authorities also show, that though the carrier is no longer upon such notice and after a reasonable time responsible as a common carrier, yet he remains responsible as depositary of the goods of the consignee, this

obligation arising on common law principles, and being entirely independent of his original contract as a common carrier.

I can see no good reason, why these principles, which have been applied to all other common carriers whether by land or water, should not be equally applied to common carriers by railroad. If we so apply them, the responsibilities of a railroad company as a common carrier continue, until the consignee has been notified of the arrival of the goods at the depot or has been otherwise informed thereof and has had a reasonable time in the common course of business to take them away after such notification or knowledge. And after this time the railroad company must be considered no longer responsible for the goods as a common carrier and therefore insurer (except against the act of God or the public enemy) but only responsible for them as a depositary. This would seem just. As a common carrier it is bound to deliver the goods to the consignee or his agent personally at the depot; for it seems clear that the parties must have contemplated the depot as the place of delivery. The kind of delivery required of a railroad company should be the same as that required of every other common carrier whether by land or water, that is an actual delivery to the consignee or his agent by transfer of the possession of the goods to the consignee or his agent personally. But as in the case of boats it is impossible for the railroad company to make such delivery of possession to the consignee or his agent, unless he is personally at the depot, the place of delivery. If therefore he is not there, when the cars arrive, the railroad company ought to notify him of the arrival of the goods at the depot, just as the carrier by water ought to notify the consignee of the arrival of his goods at the wharf. If such notification be given the consignee whether in the case of the railroad company or of the carrier by water, if he wishes to hold the railroad company longer responsible as a common carrier, he must in a reasonable time according to the course of business go or send to the depot for his goods, just as the consignee, when the transportation is by water, must in a reasonable time after notification by the carrier by water of the arrival of his goods at the wharf go or send for them,

and, if he fails to do so, he can no longer hold the carrier by water responsible as a common carrier for the goods. For the law, after the consignee has had this reasonable time in the common course of business to take his goods away after such notification, ought to excuse the railroad company from its obligation as a common carrier to deliver the goods. For it has been prevented from fulfilling this obligation by the action of the consignee. A common carrier by water all the authorities would be excused under like circumstances from his obligation as a common carrier to deliver the goods. And I see no reason why the railroad company should not under these circumstances be excused in like manner; and, so far as I know, all the authorities agree that the railroad company would then be excused.

But it has been held by courts of high standing, that, if a railroad company has built a warehouse at the depot and placed the goods in this warehouse, their responsibility for the goods as common carriers ceases. They do not say that these acts will relieve the railroad company of its obligation to deliver the goods to the consignee; but they say, that either no contract or obligation ever rested on the railroad company to deliver the goods to the consignee, or if any such obligation ever did rest on the railroad company as a common carrier, it was fulfilled when the company placed the goods in the warehouse, as it then as common carrier delivered the goods to itself as wharfinger and agent of the consignee. These views were first set forth in a manner, which gave them weight and authority by Chief Justice Shaw in *The Norway Plains Company* v. *Boston and Maine Railroad*, 1 Gray 272. He says:

"We may then say in the case of the goods transported by railroad, either that it is not the duty of the company as common carriers to deliver the goods to the consignee, which is more strictly conformable to the truth of the facts; or in analogy to the old rule, that delivery is necessary, it may be said that delivery by themselves as common carriers, to themselves as keepers for him, conformably to their agreement of both parties, is a delivery which discharges their responsibility as common carriers."

But neither of these positions can, it seems to me, be

maintained, as both of them are in conflict with well settled principles of the common law in reference to common carriers of every other sort whether by land or by water. How can it. be said, that "it is not the . duty of the company as a common carrier to deliver the goods to the consignee." It has been as long and as firmly settled to be the duty of all common carriers to deliver the goods to the consignee, as it has been that it was their duty to carry them. The railroad company coming directly within the definition of a common carrier is necessarily responsible not only for the safe carriage but safe delivery of the goods to the consignee, as any other carrier is. And if it be true, that a railroad company is under no obligation to deliver the goods to the consignee, then it must be true, that the company is not a common carrier. For it can not be a common carrier in any proper sense of the word, if it is exempt from one half of the duties imposed on all common carriers. Nor does it seem to me that the second position of Chief Justice Shaw is any more happy, viz : that by placing the goods in their warehouse "they delivered as common carriers the goods to themselves as keepers for him conformable to an agreement of both parties." It is supposed by him, to use his own, language page 274, that "the immediate and safe storage of the goods on arrival in warehouses provided by the railroad company and without additional expense seems to be a substitute better adapted to the convenience of both parties." Now as shown by Judge Cooley in his opinion, from which I have already quoted, delivered in *McMillan et al.* v. *Michigan Southern Railroad Co.*, 16 Mich. 106, *et seq.*, it is satisfactorily shown, that warehouses are built by railroad companies, because they are absolutely essential to enable them to carry on profitably or safely to themselves their business as common carriers. They are as indispensable to their business as common carriers as are their engines. On the other hand, as Judge Cooley in his opinion (p. 107) shows, the interest of the consignee in these warehouses, if he has any, is indirect and far less important. The existence and use of warehouses may facilitate the delivery to him of his goods; but the railroad company is liable if they are not delivered in a reasonable time, and that it might fulfil this obligation it built the warehouse. It is true

that the warehouse diminishes the risk of the loss or injury to the goods; but against them the railroad company as a common carrier insures him, and to diminish the responsibility incurred by this insurance the warehouses are built by the railroad company.   Justice Shaw in his opinion infers, that the consignee has impliedly entered into a contract with the railroad company, that as a common carrier it shall deliver his goods, when they arrive at the depot, to itself as wharfinger simply from the fact that the railroad company has erected these warehouses as indispensable to the profitable and safe transaction of its business; and he draws this inference notwithstanding the fact, that the consignee almost always desires his goods to be delivered to him as speedily as possible and does not want them kept in a warehouse.   The contract therefore expressed or fairly implied, when goods are transported by a railroad, is that as a common carrier the railroad company will transport the goods and deliver them to the consignee.

It seems to me the inference is entirely unjustified that there is an implied contract that the railroad company will as a common carrier transport the goods to its depot at or near the residence of the consignee, and when they reach such depot, that the railroad company will for the accommodation of the consignee store them in its warehouse.   Yet the whole view of Chief Justice Shaw is based on this supposed implied contract; or at least his views must fall, if such supposed implied contract is not regarded as a justifiable inference.   If there be no such contract, then of course there would by the transfer of the goods to the warehouse be no sort of delivery actual or constructive.   This depositing of the goods in the warehouse with or without notice to the consignee has been called by some of the judges a constructive delivery and as such a compliance by the railroad company with its contract as a common carrier to deliver the goods to the consignee.   This seems to me peculiarly inappropriate language.   The delivery to the consignee required of the common carrier is not a constructive delivery of any kind.   It is an actual delivery by the transfer of the possession to the consignee.   And a railroad company can discharge this obligation to deliver the goods to the consignee

or his agent only by actual delivery by transfer of possession
to the consignee or his agent.   It is true, as we will presently
see, that the putting of the goods in the warehouse of the
railroad company and the notifying of the consignee of their
arrival at the depot or the simple notice to the consignee, if he
after such notification fails to come or send for the goods,
relieves the railroad company as a common carrier from its
obligations to deliver the goods to him.   But it can with no
propriety be called a delivery of the goods to the consignee
or a substitute for such delivery; nor can the railroad com-
pany properly be said to have complied with its contract.   It
has been excused from the performance of its contract; but
though that may effectually relieve the railroad company from
responsibility as a common carrier, as if it had discharged
its obligations, yet it is in other respects essentially different;
and the loose use of language in calling that a performance
of the carrier's contract, which was in reality no perform-
ance of it but simply a release from his obligation to perform
his contract, has in my judgment led to much confusion in
the consideration of what constituted a delivery by a com-
mon carrier to the consignee.

The only real difficulty in determining, whether in order
to discharge or excuse a railroad company from its duty as
a common carrier to deliver the goods to the consignee or
his agent in person at the depot, the railroad company must
not notify the consignee of the receipt of the goods at the
depot or prove that the consignee had otherwise knowledge
of the fact that the goods were at the depot ready for delivery
to him, arises from the fact, that the failure of the consignee
to know of the arrival of the goods at the depot may be the
result of gross negligence on his part, as he may have been
and often is notified by the consignor of the shipment of the
goods, and being so notified, it may be claimed, he ought by
calling at the depot to ascertain the time of the arrival of the
goods, and, if he fails to do so, he is in fault and thus by his
own negligence prevents the delivery of the goods to him
promptly on their arrival, and for that reason the common
carrier ought to be excused or discharged from its perform-
ance.   Judge Cooley in his opinion in *McMillan* v. *Michigan
Southern Railroad Co.*, 16 Mich. 104, shows, that on the

through lines of railroad the shipment of goods is so much delayed and the running of the freight-trains is so uncertain and variable, that a notification of shipment ought not to be regarded as imposing on the consignee the duty of ascertaining when such goods arrived at the depot. If this duty is imposed on him, it will require the consignee to make enquiry from day to day at the depot perhaps for weeks in order to ascertain whether his goods have actually arrived, for they frequently arrive weeks after they are put in the hands of the railroad company for transportation. This is an unreasonable requisition to be made of the consignee; and his failure to make these enquiries and ascertain, when his goods actually arrived at the depot, ought not to be attributed to him as negligence. But even if the freight-trains were more regular and it would be less trouble for the consignee to ascertain, when his goods actually arrived at the depot, still, it seems to me, this would not excuse the railroad company, if it would be relieved of its obligation as a common carrier, from notifying the consignee of the arrival of his goods. The railroad company has undertaken to deliver these goods to the consignee at the depot, and it can not be excused from the fulfillment of this contract, before it has done all it can to perform it. To enable it to perform this contract the consignee or his agent must be at the depot. They may perhaps be there without any active effort on the part of the railroad company to get them to come. But the company can not be discharged from the peformance of its contract as a common carrier, till it has notified the consignee that it is ready to perform it, unless the consignee has this knowledge without such notification. I can not see how it can be in any case held to be the duty of the consignee to make enquiries of the common carrier as to whether it is ready to perform its duty and deliver the goods at the depot. If the consignee has actual knowledge that the goods are at the depot ready to be delivered, and he fails to go or send to the depot for them, his own conduct has prevented the railroad company from fulfilling its obligation, and the railroad company would be therefor excused or discharged from this obligation and would thereafter hold the goods simply as a depositary of another's goods with the obligations imposed by law on all deposita-

ries, obligations far less onerous than those imposed on the common carrier. But if there is no obligation on the consignee to make enquiry at the depot to ascertain, whether his goods have actually arrived, then no act of his has by preventing the railroad company from the performance of its duty relieved it of its responsibility as a common carrier, until he has been notified of the arrival of the goods at the depot or otherwise knows thereof and fails to go or send for them.

The agents of the Baltimore and Ohio Railroad Company claimed in this case, that the putting of the car containing the wheat consigned to the defendants below about ten o'clock A. M. of February 6, 1884, upon the switch near the depot, where this consignee could conveniently unload it, and where they had been in the habit of placing cars addressed to them for that purpose, was a delivery of the wheat to them. I find but a single case, where any countenance has been given to such a view, and that is *The Chicago and Rock Island Railroad Co.* v. *Warren et al.*, 16 Ill. 502. This case however receives no countenance from any other decision which I have seen. Omitting this case the decisions, which require the least to be done by the railroad company to relieve itself of its responsibility as a common carrier, are those I have cited as sustaining the proposition, that when the transit is ended, and the railroad company has placed the goods in its warehouse to await delivery to the consignee, its liability as common carrier is ended, and it is responsible only as a warehouseman, even though the consignee is neither notified nor had knowledge of the arrival of his goods at the depot. This in my judgment was going too far; but to hold, as this Illinois case does, that the railroad company may relieve itself of its responsibility as a common carrier without storing the goods in its warehouse, without notice to the consignee and without his having any knowledge of the arrival of the goods, by leaving or putting them in a car, and simply separating it from the train and placing it on a switch in the care of some of its employes, is going much further and ought not to be, as it has not been, so far as I know, regarded anywhere else as law. I do not hesitate to say that in this case the evidence shows beyond controversy,

that the Baltimore and Ohio Railroad Company never did deliver this carload of wheat to the consignees, M. & J. Pollock, and that it remained responsible as a common carrier for the safe custody and care of this wheat.

Whether under the facts in this case they were or were not as common carriers responsible for the injury to the wheat from the flood, or whether they would be excused, because this was the act of God, I need not consider. It is a question foreign to this case and I express no opinion in reference to it.

The arrival of this carload of wheat at the depot in Wheeling and the placing of it by the agents of the Baltimore and Ohio Railroad Company on the switch near the depot, that M. & J. Pollock, to whom it was consigned, might conveniently unload it, being, as we have seen, no delivery of the wheat by the Baltimore and Ohio Railroad Company as common carriers to M. & J. Pollock, it is insisted by their counsel, that the same identical acts can not be considered as a delivery to them of this wheat by their vendor, S. L. Bloyd, according to the terms of his bargain and sale. This argument is very plausible and would be unanswerable, if the same sort of delivery to the vendee was in every case required of a vendor to complete his sale, as is required by law to relieve a common carrier of his responsibility to deliver the goods to the consignee. But, as we shall presently see, the delivery required of a vendor to complete a sale is in very many cases entirely different from the delivery required of a common carrier to relieve him of responsibility for a full performance of his contract. The principle difficulty in determining the law in this case as in many others arises from the fact, that unfortunately this word delivery is used in the reports and law-books generally in two widely different senses. It is most frequently used in reference to the change of possession of a chattel; but sometimes it is used in reference to the change of the property in a chattel, which may in certain cases take place without any change of possession. In other words this word " delivery " is generally used to denote transfer of possession ; but it is some times used to denote simply transfer of title unaccompanied by any change of possession. On this subject Benjamin in his excellent work on Sales, Part II, ch. 2. § 675, says: " The

word delivery is sometimes used with reference to the passing of *the property* in the chattel, sometimes to the change of *the possession* of the chattel; in a word it is used in turn to denote transfer of *title* or transfer of *possession*." In the preceding section he says : " There is no branch of the law of sale more confusing to the student than that of delivery. This results from the fact that the word is unfortunately used in very different senses, and unless these different significations are carefully borne in mind, the decisions would furnish no clue to a clear perception of principles."

As a familiar example of the use of this word deliver in these two essentially different senses I would put this case. Upon a sale of goods generally, such as was the sale proven in this case, no property passes till delivery ; for until then the very goods sold are not ascertained, yet it is well settled, that the delivery of goods to any common carrier, whether a particular carrier has or has not been designated by the vendee, for the purpose of having them conveyed to the vendee or to a place designated by the vendee, vests the property in the vendee. (*Magruder & Brother* v. *Gage*, 33 Md. 344 ; *Dutton* v. *Solomonson*, 3 Bos. & Pal. 582 ; *Keulder* v. *Ellison et al.*, 47 N. Y. 36 ; *Stanton* v. *Eayer*, 16 Pick. 467 ; *Woolsey* v. *Bailey*, 27 N. H. 217 ; *State* v. *Hughes*, 22 W. Va. 743, and the authorities there cited.) If M. & J. Pollock had bought this carload of wheat of Bloyd, and nothing had been said about the delivery, the moment the carload of wheat was shipped at Glen Easton on the Baltimore and Ohio Railroad to M. & J. Pollock at Wheeling, it would have been the property of M. & J. Pollock; and if it had been lost, before it reached Wheeling, it would have been their loss. In other words the carload of wheat would have been regarded as delivered to M. & J. Pollock at Glen Easton ; and yet the Baltimore and Ohio Railroad Company would not be held to have delivered it to M. & J. Pollock by placing the car on a switch after its arrival in Wheeling for the convenience of M. & J. Pollock in unloading the car. Of course the carload of wheat would be regarded as delivered by Bloyd to M. & J. Pollock if by the bargain and sale it was to be delivered at Glen Easton as soon as it was placed on the car there. The Baltimore and Ohio Railroad would be regarded as the agent of M. & J. Pollock

to receive the wheat at Glen Easton ; and if the wheat was to be delivered at the depot in Wheeling, it seems to me, as soon as it reached the depot in Wheeling, it would be held to be the property of M. & J. Pollock, and the railroad company would be regarded as holding it for them as their agent.

Many other examples might be given where goods are regarded as delivered in the sense of a transfer of title, when there was in fact no delivery in the sense of a transfer of possession.   As for instance when the property is, when sold, in the hands of a third person, and he agrees to keep it for the vendee, this perfects the sale, and there is a change in the title of the property, it belonging to the vendee as completely as if he he had been put in actual possession of the same (*Potter* v. *Washburn*, 13 Vt. 558).   And in such case to complete the sale and make a complete transfer of the title of the property it would suffice, that the vendor should simply notify the vendee.   *Mayer* v. *Billingsley*, 3 Ala. 679 ; *Pleasants* v. *Pendleton*, 6 Rand 475).

If the principles laid down in these cases be applied to the case before us, they seem to lead necessarily to the conclusion, that, when the carload of wheat which was injured on February 6, 1884, in the evening by the flood wetting the wheat, reached the depot in Wheeling the place of delivery, it was the property of M. & J. Pollock, who had been notified, that the wheat had been shipped, that is, put in the possession of the Baltimore and Ohio Railroad Company for their use.   Indeed it seems to me clear, that no notice of the fact, that the wheat was in the actual possession of the Baltimore and Ohio Railroad Company, was necessary in this case, as the understanding between vendor and the vendees at the time of the sale was, that the wheat should be put in the hands of the Baltimore and Ohio Railroad Company at Glen Easton for the use of the vendees when it reached the depot at Wheeling.   So in the case of *Claflin and others* v. *The Boston and Lowell Railroad Co.*, 7 Allen 341, it was held : "If in pursuance of an executory contract of sale the owners of merchandise send a quantity of it to the place named for delivery and notify the purchaser thereof and furnish him with an order to obtain it from the carrier, and the purchaser paid therefor, this is sufficient to vest the

title in the purchaser." This case is in principle the same as the one before us. It is true, there was in the case before us no order on the Baltimore and Ohio Railroad Company to deliver this wheat to M. & J. Pollock. There was no necessity for such an order in this case, because the car was addressed to M. & J. Pollock, the wheat being consigned to them, and they were entitled to receive it, this consignment itself being an order to deliver the wheat to them. In the Massachusetts case a part of the merchandise was directed to the care of a third person, and an order on the railroad company to deliver it to the purchaser was proper. Nor was it necessary in this case that Bloyd should have received pay for the wheat, as it was understood between him and M. & J. Pollock, that he was not to be paid, till after they had received the wheat and paid the railroad company for the freight out of the price to be paid for the wheat.

Story in his work on Contracts, sec. 1017, says: "The first rule of law applicable to delivery, and to which all other rules are subordinate, is, that no sale is complete, so as to vest an immediate right of property in the buyer, so long as anything remains to be done between buyer and seller;" and then in sec. 1018 : "But when the sale is completed, and the goods sold are separated from all others, and marked, and there remains nothing more for the seller to do in relation to them, the contract of sale becomes absolute, and no further delivery is required to pass the property; or as has been recently stated, by the law of England by a contract for the sale of specific ascertained goods the property immediately vests in the buyer, and the right to the price in the seller, unless it can be shown, that such was not the intention of the parties. See *Gilmour* v. *Supple*, 11 Moore P. C. 551." Story then proceeds to illustrate these positions by many cases. The first rule has some apparent exceptions. But the rule, that, when nothing more remains to be done by the seller in relation to the goods, the contract of sale becomes absolute, and no further delivery is required in order to pass the property, seems to be universal.

I deem it unnecessary to cite other cases in addition to those already cited illustrating this rule. But I will refer to a few other cases, which illustrate it, and which are so

very similar to the case before us, as to control us in determining the question upon the facts proven in this case, to whom this carload of wheat belonged, at the time the wheat was injured by the flood on the evening of February 6, 1884.

The first of these cases is: *Fry & Hartman* v. *Lucas*, 29 Pa. St. 356, the syllabus of this case is: "When one party agreed to deliver to another corn in sacks, furnished by the latter for the purpose, at a designated point, upon the arrival of the grain at the designated place the property is vested in the purchaser, and the title of the vendor is completely divested." This case is, it seems to me, entirely undistinguishable from the case before us in reference to the question, whether the grain became the property of the vendees, as soon as it arrived at its place of destination. But it is claimed by the counsel of the vendees, the plaintiffs in error, that it is not even persuasive authority on this point, because Pennsylvania is one of the States, where it is held contrary to the conclusion we have reached, that "where goods have been carried to their place of destination and there deposited in the carrier's warehouse, to await the owner's convenience in taking them away, the carrier is no longer subject to the responsibilities of the common carriers." See *McCarty et al.* v. *The New York & Erie Railroad Company*, 30 Pa. St. 247. I am unable to see, that this holding of the law in reference to what will relieve a railroad company of its responsibility as a common carrier to deliver goods to the consignee has the least effect in preventing the Pennsylvania case, to which we have referred, if regarded as a sound case, from conclusively settling that M. & J. Pollock were the complete owners of this wheat when it was injured by the flood. The statement of that case is that the corn was shipped "to be transported over the railroad to Allegheny Station and there delivered to the purchaser, Lucas, or at the company's freight house." It is further stated that "the car in which the corn had been shipped arrived at the Allegheny Station on the morning of March 31, where, before it was unloaded from the car, and before any notice had been given to Lucas of its arrival, it was seized as the property of the vendors by the sheriff on an execution against them." The question was whether it was really the property of the vendee, Lucas.

The court decided it became the property of Lucas, the vendee, immediately on the arrival of the car at Allegheny Station. The contract of sale was in these words that he "Lucas would take from the vendors 300 bushels at sixty cents per bushel, delivered at the depot in Allegheny City and would pay on the delivery of the corn."

Woodward, judge, delivering the opinion of the court, says : " When the corn arrived at the depot in Allegheny City the vendors had performed the contract according to its very letter. The plaintiffs were not to accompany the corn nor send an agent to make delivery of it, but it was to be entrusted to a common carrier and delivered at their depot. That was done. The contract of sale was consummated. At that moment then, when the corn arrived at the designated point with only the carrier's lien upon it for freight, which the defendant was bound to extinguish, it ceased to belong to the vendors and became the property of the vendee. Thenceforth the vendors only interest was in the price. Had the corn been destroyed after that by fire or storm, or had any accident befallen it, the vendee and not the vendor must have born the loss."

This case, if law, determines that as between the vendor Bloyd and the vendees M. & J. Pollock, the vendees must bear the loss produced by the injury of the wheat by flood or in any other way, after it arrived at the depot in Wheeling. It seems to me to be immaterial, whether the railroad company was or was not responsible after the arrival of the grain at the depot for its safe delivery. It is supposed that this is an important matter, and should control this decision. It is assumed in the argument, that as soon as the cars arrived at the depot, the grain was by the law of Pennsylvania regarded as though it was delivered to the vendee, and that was the reason why the court held, that it was the property of the vendee as soon as it arrived at the depot. But the court assigned no such supposed reason for its decision, and indeed it could have assigned no such reason, for by the law of Pennsylvania, as well as by our own law, this grain could not have been regarded as delivered by the railroad company, as soon as it arrived at the depot. For by the law of Pennsylvania, as decided by their courts, the railroad company

could get up no pretence that it had done the equivalent of delivering the corn till " the corn was deposited in the warehouse of the railroad company." And the statement of this case is expressly that " the corn was not unloaded from the car, and of course not put in the warehouse, and Lucas was not notified of its arrival." So that under the law of Pennsylvania as well as our law the railroad company would not be discharged from its liability as carrier to deliver the grain to the consignee. If therefore this Pennsylvania decision be good law in Pennsylvania, it is equally good law here, and the case before us is almost identical with it.

The next case to which I would refer is the *Pacific Iron Works* v. *Long Island Railroad Company*, 62 N. Y. 272. In that case "The plaintiff contracted to furnish to the defendant certain goods to be shipped at B. by a steamer named, plying between that place and New York, and to be delivered on board the steamer at Peck Slip, New York free of charges. Defendants requested notice of the shipment. The goods were shipped, consigned to the defendants, charges paid by plaintiff and notice of the shipment given as agreed upon. The vessel arrived safely at Peck Slip, New York, the designated place for the delivery of the goods. In an action to recover the contract price of the goods it was held, that upon such arrival of the steamboat with goods aboard at Peck Slip, New York the delivery was complete without notice to the defendant of such arrival, and the contract of the vendor was performed, the carrier then becoming the agent of the vendee and holding the goods for it; and the plaintiff, the vendor, was entitled to recover although the vendee failed to call for and receive the goods."

The principle decided in this case would, it seems to me, clearly entitle Bloyd, the vendor, to recover of M. & J. Pollock, the vendees, the price of the wheat in the case before us. As the wheat on the principles laid down in this case must be regarded as delivered upon its arrival at the depot in Wheeling, the place designated for the delivery, and that too though no notice of such arrival was given the vendees. The contract of the vendor was performed on the arrival of the wheat at the depot in Wheeling; and the Baltimore and Ohio Railroad Company then became the agents of the ven-

dees holding the wheat for them. It is admitted by the counsel for the vendees, that this would be the necessary and proper application of the principles decided in the New York case, if by the contract of sale it had not been stipulated, that the vendor should give notice to the vendee of the shipment of the goods. No such notice was required in the contract of sale in the case before us, though it was in point of fact given. It is insisted, that, as the vendee contracted, that the vendor should give this notice of shipment, he then impliedly surrendered his right to have notice of the arrival of the goods at Peck Slip, New York. And that but for the contract requiring this notice of shipment to be given the court would have held, that to complete delivery by the vendor to the vendee it would have been necessary to give notice of the arrival of the goods, as by the decisions of the New York court a steamboat could not be discharged from its obligations as a common carrier to deliver the goods to the consignee, the vendee, except by the giving of such notice. But to show, that the court did not regard, that there was any implied contract, whereby the vendee agreed to dispense with a notice, which it would otherwise have been entitled to receive, I think it is only necessary to quote a portion of the opinion of the court in that case showing the reasons, on which their decision was really based :

"The carrier held the goods at the risk of the vendor until the vessel and goods reached the place of delivery. He then became the agent and held the goods for the vendee, the consignee. The vendor did upon the completion of the voyage, and the arrival of the vessel, deliver the goods on board the vessel at Peck Slip for the vendee. They were at the place and in the possession of the persons designated by the contract of sale for the vendee. The contract was special and must have effect according to its terms. The vendee had not required any notice from the vendor of the arrival of the goods in New York. The vendee requested the vendor to notify it of the shipment, and such notice was given. If any other notice was required by or necessary for the vendee it should have been given by the agent of the vendee, the carrier having the goods. Had the contract been for delivery at a particular warehouse, a deposit of the goods

at the place appointed would have been a tull performance by the vendor, and the case is not different merely because the place of delivery, the place at which the vendor was requested to leave them for the vendee, chanced to be on the vessel by which they were transported to the place of delivery. No nominal change of position of the goods was necessary to complete the delivery."

It is obvious from this reasoning, that the court considered, that, as the vendee stipulated for notice of shipment, he was entitled to such notice, and he got it. If the vendee had stipulated for notice of the arrival of goods at Peck Slip, New York, it would have been entitled to such notice from the vendor; but as it did not stipulate for such notice, it was not entitled to it from the vendor, in order to complete the sale and make the goods the property of the vendee, though the the vendee might be entitled to such notice from the common carrier, who was the agent of the vendee from the moment the vessel arrived at Peck Slip New York. This common carrier may not have discharged itself from its obligation to deliver the goods to the consignee, until it gave such notice of their arrival; but the vendor was under no obligation to give such notice to the vendee in order to complete the sale and transfer the title of the goods to the vendee, nor would the vendee have had any. right, in order to the completion of the sale, to any notice of the shipment, had it not been stipulated for in the contract. In short, so soon as the vendor had done everything in reference to these goods, that his contract required him to do, the title of the goods was transferred to the vendee.

Applying this reasoning to the case before us M. & J. Pollock, the vendees, had no right to require ot Bloyd, the vendor, either notice of the shipment of the wheat or of its arrival at the depot in Wheeling, in order to complete this sale and transfer this title to them, though they did have a right to require notice of the arrival of this wheat from their agent the Baltimore and Ohio Railroad Company, and if such notice was not given the Baltimore and Ohio Railroad Company is not discharged of its responsibilities to deliver the wheat to the consignees, M. & J. Pollock.

It is insisted by the counsel for the plaintiffs in error,

that the construction, which I have placed on this New York
case, is inconsistent with a prior decision of the supreme
court of New York, in *Newcomb* v. *Cranmer* 9 Barb. 402.   I
do not think there is any inconsistency in this decision ; nor
do I think that the court of appeals of New York in de-
ciding the last case regarded it as overruling the principles
decided in this case in 9th Barbour.   That case was not re-
ferred to by the court in deciding this case in 62 N. Y.; nor ,
was it referred to by the counsel arguing this case, though
another case in 9th Barbour was referred to.   The infer-
ence I draw from this, is that neither the counsel nor the
court regarded this case in 9th Barbour as pertinent to the
question under consideration, and did not for a moment re-
gard it as in conflict with the conclusions reached in this
case in 62 N. Y.   And an examination of the case leads
me to the same conclusion.

The seventeenth section of the English Statute of Frauds
29 Char. II. c. 2 provides, that no contract for the sale of any
goods for a price exceeding a certain sum shall be allowed
to be good, unless the purchaser shall accept part of the
goods so sold and actually receive the same or give some-
thing in earnest to bind the bargain or in part payment or
some note or memorandum of said bargain be made and
required by the party to be charged by such contract or by
his agent thereunto by him lawfully authorized.   This statute
has been re-enacted in many of the States or something
in lieu of it.   The amount to be given to bind the bargain
varying in different States.   In Maine it was $30, (see *Max-
well* v. *Brown*, 39 Me. 101.)   In New York it is or was $50.
(See Revised Statutes of N. Y. vol. 3, p. 222 of Banks &
Brothers, 5th Edition).   When a statute of this sort exists,
and the purchaser has signed no note or memorandum in
writing of the bargain, it is well settled, that besides a deliv-
ery of the goods there must be an acceptance of them by the
purchaser.   (See Benj. on Sales, ch. 4.  Book 1 and the vari-
ous authorities referred to by him and among them *Max-
well* v. *Brown*, 39 Me. 101; see note sec. 142 of Benj. on Sales
p. 134).   Now this case of *Newcomb* v. *Cranmer*, 9 Barb. 402
was a sale of goods amounting to $95.07 and came within
their statute of frauds, there being no memorandum or note

in writing of the bargain signed by the purchaser, though there was such a memorandum signed by the seller. Hence on the very face of the contract it was necessary in order to maintain an action against the purchaser, or to hold the contract binding on him, that it should be proven that he had accepted the goods, and this acceptance was according to the decision something distinct from the delivery of the goods. The court held and, it seems to me, properly, that there was no acceptance of the goods by the purchaser, of course the mere delivery of the goods at a store-house without notice to the purchaser could not pass the title. For under this statute of frauds, as it exists in New York, the purchaser had under this contract the right to refuse the goods; and in that case not having had any notice of their delivery and not having seen the goods he would not be regarded as having accepted them. Of course therefore the purchaser did not accept the goods, and on the facts proven the court held, that the agent, by whom it was claimed they accepted, had no authority to accept them. If this be, as I think it is, the true character of this case, it is not surprising, that it should not be referred to by the New York court of appeals in *The Pacific Iron Works* v. *Long Island R. R. Co.*, 62 N. Y. 272, when the question was, what was a sufficient delivery of goods sold. I do not think I have misunderstood this case in 9 Barbour, for, though the case, which is very brief, does not refer to their statute of frauds, yet it is apparent, that the question in controversy was, whether the goods had been accepted, a question, which must have arisen, if the case came within their statute of frauds, and would hardly have been the subject of discussion otherwise. Because of the brief and imperfect opinion of the court in that case the counsel in this case have regarded this as a case based on common law principles, and as though there had been no provision in the New York statute of frauds like sec. 17 of the English statute of frauds. This mistake of counsel has been no doubt in part brought about by the fact, that we have in our statute of frauds no provision like this sec. 17 of the English statute. But even if I have misunderstood this unsatisfactory and brief New York opinion, it would not alter my view; for I could not but regard

the decision rendered by the court of appeals in 62 N. Y., to which I have referred, as more worthy to be followed, even if the cases conflicted.

My conclusion therefore is, that on the evidence in this case there can be no question, that M. & J. Pollock were the owners of this carload of wheat from the moment when it reached the depot in Wheeling on February 5, 1884; and that the verdict finding for the plaintiff and assessing his damages at the price, at which the defendants bought this wheat with interest from February 5, 1885, was in accord with the evidence; and that this verdict could only be set aside for errors prejudicial to the defendants committed by the judge during the trial, if any such errors there be.

We will now consider the various acts of the judge pending the trial and determine, whether the defendants were prejudiced by any of them. The three instructions given by the court to the jury at the instance of the plaintiff were clearly right being in accord with the principles above laid down. A number of the instructions asked by the defendants were based upon an hypothesis, which there was no evidence to sustain. All such instructions were properly rejected. Even had there been some evidence tending to support any one of these hypotheses, yet, if the weight of the evidence was so strong against such hypothesis, that the court would have been compelled to grant the plaintiff a new trial on the ground that the verdict was contrary to the weight of the evidence, if the jury had rendered a verdict in favor of the defendants, apparently based on the assumption that the hypothesis was true, yet the court ought to have refused such instruction. For it would be an absurdity on the part of the court after instructing a jury, if they believed certain facts, to find for the defendants, to set aside a verdict for defendants which the jury were induced to find by its own instruction. If therefore the court believes, that the hypothesis, on which an instruction is based, is supported by some evidence, but that the weight of the evidence is so strongly against the hypothesis that the the court would set aside a verdict based on the truth of such hypothesis, it ought not to grant any instruction based on such hypothesis. Several of the instructions asked by the defendants' counsel were based on the hypothesis, that the

wheat was to be delivered *on* the depot in Wheeling; one of them that the wheat was to be delivered on the platform or platforms of the depot or other part of the depot. As we have seen that there was really no evidence tending, when properly considered, to support these hypotheses, we can assuredly say with confidence, that the weight of the evidence was so much opposed to these hypotheses, that if the jury had clearly based their verdict in favor of the defendants on either of them, the court ought to have set aside the verdict as contrary to the weight of the evidence; if not contrary to the whole evidence, as we believed it would have been.

Another instruction asked by the defendants' counsel was, that the goods were to be delivered *at* the city of Wheeling; and when the court proposed to change this hypothesis to "*at* a place specified in the contract of sale in the city of Wheeling," the defendants objected to any change in their hypothesis or in the instruction. The entire evidence both of the plaintiff and of the defendants shows beyond controversy, that the contract was "to deliver the wheat at a place specified in the city of Wheeling;" and none of the evidence even tended to show, that by the contract it was to be delivered *at* the city of Wheeling not specifying the place in the city of Wheeling where it was to be delivered. Instructions therefore based on this hypothesis ought not to have been given when the defendants' counsel refused to permit the hypothesis and instruction to be changed so as to correspond with the facts as proven by all the evidence beyond all controversy.

For these reasons and because the instructions asked violated the law, as we have laid it down hereinbefore, all the defendants' instructions ought to have been rejected. Instead however of rejecting them the court modified and then granted a few of them as thus modified. None of these instructions, as thus modified and granted, could possibly have been prejudicial to the defendants, some when so modified and granted were right and some of them were erroneous. Those which were erroneous according to our views of the law as above given were obviously prejudicial to the plaintiff, and the defendants can not be heard to complain of them. Instructions Nos. 2 and 3 ought to have been refused and not

given with the modification as they were; but the defendants could not have been injured by the instructions as they were given, but they were obviously prejudicial to the plaintiff. Instruction No. 4, which was given, ought to have been rejected. Instructions Nos. 5 and 6 were properly rejected. Instruction No. 7 ought to have been refused without modification; as modified and granted by the court it was erroneous; but the error in it was obviously in favor of the defendants. This instruction, as proposed by the court to be given, declared that the agency of the railroad company for the vendor continued until it made delivery at the place specified according to law to the buyer." We have seen, that the agency of the Baltimore and Ohio Railroad Company for the plaintiff, the vendor, did not continue till it made delivery according to law to M. & J. Pollock, the vendees, which it never did; but this agency of the Baltimore and Ohio Railroad Company for the plaintiff, the vendor, ceased the moment the car of wheat reached Wheeling, and before the Baltimore and Ohio Railroad Company delivered the wheat to the vendees according to law, the only mode of delivery being a personal delivery to the consignees. This was an error well calculated to mislead the jury. Had this erroneous instruction been obeyed the jury would have found for the defendants. Of course they can not complain of its having been given.

It is further claimed that the court erred in permitting the letter of S. L. Bloyd to M. & J. Pollock notifying them of the shipment of this wheat to go to the jury against the protest of the defendants. Now the record shows, that it had already been proven without objection, that the defendants had notice of this shipment. And this evidence being before the jury I can not conceive how the more distinct proving of the same fact by the production of the letter could prejudice the defendants.

Again, when on cross-examination Mortimer Pollock, one of the defendants, was asked: "Did you ever cause the plaintiff to unload the cars of wheat?" He answered, "Not a full carload; no sir." The defendants' counsel objected to this answer. But they ought to have objected to the question before the answer was made. They could not take the

chance of obtaining a favorable answer and then object to the answer, when it proved unfavorable. But if the objection had been properly made, it ought to have been overruled as it was; for the answer, as we have seen, tended most materially to interpret the contract of sale between the plaintiff and defendant, which was the basis of this suit.

The only other error, which, it is insisted, the court committed during the progress of the case prejudicial to the defendants is this: "that during the first address of the plaintiff's counsel to the jury, after all the evidence had been submitted, he cited to the jury the case of the *Pacific Iron Works* v. *Long Island R. R.*, 62 N. Y. 272, and offered and began to read the said case from the printed volume of said reports to the jury, though the defendants by their counsel objected to the same being read to the jury." It would be a sufficient answer to this objection to say, that after a careful consideration of the subject as shown hereinbefore we have reached the conclusion, that this case was applicable to the questions raised in the case before the jury, and that it correctly lays down the law and therefore could not have prejudiced defendants. But if the law had been incorrectly laid down in this case, we are satisfied, that the defendants could not in this Court ask a reversal of the judgment of the court below, because it permitted the plaintiff's counsel to read it to the jury. To sustain their position, that the court when asked ought to have forbidden the plaintiff's counsel to read law to the jury, the counsel for the defendants below in this Court rely upon two cases in Illinois, *Fuller* v. *Talbot*, 23 Ill. 357 and *Sprague* v. *Craig*, 51 Ill. 289, wherein the court said, that correct practice in civil cases is never to permit counsel to read authorities to the jury; and the court may prevent it from being done. But I suppose it is questionable whether an appellate court in Illinois would reverse a case, because the court below thought proper to allow counsel to read law to the jury. But a case in Connecticut, *Baldwin's Appeal*, 44 Conn. 40 is the case principally relied upon, where it was held, that the permitting of law-books to be read to a jury, against objection taken by the opposite counsel is ground for the granting of a new trial in the appellate court. The court say p. 40:

" The duties of the court and of the jury in the trial of civil causes are distinct and clearly defined.   It is the duty of the court to declare the law to the jury ; and that carries with it a corresponding obligation on the part of the jury to receive the law only from the court.  They have no right to receive the law from books, nor from counsel, nor are they permitted to act upon their own notions of law, but the law as laid down by the court is to be the law of the case for them."

. This may be and probably is a correct exposition of the law and practice in Connecticut.   But it is not the practice or law in this State in one important particular.  It is not the duty of the court in this State to declare the law to the jury except when asked to do so by the counsel of one side or the other; and then the law is generally declared only on points, on which the counsel on one side or the other asks instructions of the court.   Very many civil cases are tried without counsel asking any instructions of the court in reference to any point of law involved in the case.   And of course in all such cases the jury must have the right " to receive the law from books or from counsel, or are permitted to act upon their own notions of law."   If the court has been asked to give and has given instructions on any points of law, of course " the law as laid down by the court is to be the law of the case for the jury."   And doubtless the court would have the right to prevent counsel from reading law to the jury, which was in conflict with the law laid down by the court, when the court had granted the instructions prior to the argument of the jury, and as soon as the evidence was closed.   But the record in this case does not show, that the instructions were given prior to the reading of the law by the plaintiff's counsel.   On the contrary the inference is, that they probably were not, as it is said the instructions were given after the conclusion of the evidence and before the conclusion of the argument, I presume during the argument and probably after this law was read to the jury, as it was read in the opening argument.   I believe it is the practice in most of the circuits in this State for the argument of counsel to precede the granting of the instructions, and in such case there could be no impropriety in counsel reading law to the jury from the law-books, as the counsel

could not then know, whether the court would be asked to give any instructions, or, if asked, whether the law he reads to the jury would conflict with the law as it might afterwards be laid down by the court on instructions being asked, or whether the particular point, on which the law read from the books to the jury may not be a point upon which no instructions will be asked, and upon which " the jury would be permitted to act upon their own notions of the law."

But as the record has been made out in this case, it is doubtful, whether the reading by the plaintiff's counsel to the jury of this case in 62 N. Y. preceded or followed the instructions given by the court for the plaintiff, I would say, if it followed them, as it did not conflict with the law as laid down by the court, and the court thought proper to permit it to be read to the jury, the defendants can not complain. If the instructions had been given, and the law read conflicted with such instructions, it would have been proper for the court to have forbidden such law to be read, and if it refused to do so, when asked, it may be perhaps that it would, if read against the objection of the opposite counsel, and the proper exception taken thereto, be ground for an appellate court to consider the propriety of granting a new trial, if one had been refused by the court below, and such refusal excepted to, though I rather think it would then be no ground for appeal. But as the record presents no such question we express no opinion upon this point. The practice prevails in many of the States for the judge to charge the jury in every civil case; and it is his duty in such to lay down the law applicable to the case on all the facts proven. Where such a practice prevails, it is obvious, that it is much more proper for the court to interfere with the reading of law from the books to the jury by the counsel, than it would be in this State. (*State* v. *Thompson,* 23 W. Va. 756.)

Our conclusion is, that there was no error committed in the court below, prejudcial to the plaintiff in error, and the judgment rendered by the circuit court on January 9, 1885, must be affirmed, and the defendant in error must recover of the plaintiffs in error his costs in this Court expended and damages according to law.

The other judges concur in this opinion except that they

express no opinion as to whether the Baltimore and Ohio Railroad Company delivered the wheat to M. & J. Pollock by placing it upon their switch near the depot, as this question may arise in a suit, which may be hereafter brought against the Baltimore and Ohio Railroad Company, and as the decision of this case would be the same, whether or not this act of the company amounted to a delivery of the wheat. In order to refute the very plausible but unsound position of the counsel for the plaintiff in error, that as the Baltimore and Ohio Railroad Company had not delivered this wheat it was necessarily undelivered to M. & J. Pollock by the plaintiff, and therefore he could not recover in this suit, I deemed it necessary to show clearly that the delivery required of the Baltimore and Ohio Railroad Company as a common carrier was essentially different from that required of the plaintiff as a vendor, and in showing this I necessarily laid down the law as to what constituted a delivery by a railroad company, and this law so laid down necessarily led to the conclusion that the Baltimore and Ohio Railroad Company as a common carrier had not delivered this wheat. I could not in my judgment have omitted this portion of my opinion without greatly impairing the strength of the conclusion reached, that this wheat had been delivered by the vendor to the vendee, M. & J. Pollock, and upon this depended the right of the plaintiff to recover in this suit.

AFFIRMED.